Geraldine L. LIGHTENBURGER, et al.,
Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Ivory COMBS and North American Aviation, Inc., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Joan GORDON et al., and Edith Carrington, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

EAGLE STAR INSURANCE CO.,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. Nos. 64–1672, 64–1684, 64–1687
and 64–1692.

United States District Court
C. D. California.

April 21, 1969.

Morton Galane, Las Vegas, Nev., for plaintiffs Lightenburger, and others.

Oliver, Good & Sloan, Los Angeles, Cal., and Hilbrecht & Jones, Las Vegas, Nev., for plaintiffs Combs and North American Aviation, Inc.

Irving H. Green, Karl Seuthe, Los Angeles, Cal., for plaintiffs Gordon, and others, and Carrington.

William Singleton, and Rex A. Jemison, Las Vegas, Nev., and Irving H. Green and A. F. Varga, Los Angeles, Cal., for plaintiff Eagle Star Ins. Co.

William Matthew Byrne, Jr., U. S. Atty., by Donald A. Fareed, Asst. U. S. Atty., and Herbert Lyons, Office of the General Counsel, Federal Aviation Agency, Washington, D. C., for defendant the United States.

## MEMORANDUM OPINION AND ORDER FOR JUDGMENT FOR PLAINTIFFS

HAUK, District Judge.

These are four consolidated actions against the United States Government for damages for wrongful deaths, personal injuries and property damage arising out of the crash of a Cessna 310–G airplane at Los Angeles International Airport on December 6, 1962.

The pilot, James Gordon, and two passengers, Dale D. Lightenburger and Bervial Carrington, were killed in the crash. North American Aviation, Inc. facilities were damaged when the plane crashed into it. Ivory Combs, an employee of North American Aviation, Inc. who was working on the ground, sustained personal injuries. Eagle Star Insurance Company is the subrogee for hull damage to the aircraft. North American Aviation, Inc. is the subrogee for workmen's compensation paid to Ivory Combs.

The actions were consolidated, and separate trials on the issue of liability and damages were ordered by the Court on the motion of the Plaintiffs after a hearing held on August 20, 1965.

All actions charge negligence of Defendant United States of America by and through its agents acting within the scope of their agency and employment. Jurisdiction in this Court exists under 28 United States Code § 1346(b), the pertinent provision of the Federal Tort Claims Act.

Plaintiffs alleged and offered evidence upon four theories of liability. Two theories were based on ordinary negligence, and two theories were based upon liability stemming from breach of safety regulations. The Government denied negligence and violation of the safety regulations, as well as the nature and extent of the Plaintiffs' damages; and asserted the affirmative defense of contributory negligence as to the pilot Gordon.

The case was tried on October 10, 11, 13, 19, 20, 25, 26, and 27, 1967; November 7, 8, 9, 15, 16, 17, 21, and 22, 1967; December 19, 20, 21, 1967; January 23, 24, 25, 26, 1968; and February 8, and 9, 1968. The Court, after hearing all of the testimony and the arguments of counsel and being fully advised in the premises makes its decision, findings of fact, and conclusions of law in favor of all the Plaintiffs and against the United States of America with judgment ordered for the Plaintiffs and against the Government.

This action arises out of the crash of a Cessna 310–G aircraft at Los Angeles International Airport at approximately 4:10 P.M. on the afternoon of December 6, 1962.

The flight originated in Las Vegas, Nevada under an instrument flight plan giving Los Angeles International Airport as destination.

When the pilot reached the Los Angeles area, he first requested a clearance for an instrument approach to Los Angeles International Airport, but prior to beginning the approach he requested and obtained clearance to go to Santa Monica Airport. The pilot later discovered that Santa Monica Airport was closed because of weather conditions and the pilot again requested instrument approach to Los Angeles International Airport. The pilot

was then brought in contact with the instrument landing system at a point 6.4 miles from the end of Runway 25 Left designated as the Outer Marker.

The pilot requested a Precision Radar Approach (PAR) and was placed under the jurisdiction and direction of the PAR Controller, an employee of the Federal Aviation Agency (FAA).

The pilot was advised by the PAR Controller that the approach would be terminated at the Middle Marker, a point which is one-half mile from the end of the runway. The PAR Controller then proceeded to advise the pilot of his position with respect to the glideslope both vertically and horizontally as the approach was being made.

The conduct of the approach is directed and controlled by the PAR Controller and the pilot responds to and relies on advisories given by the Controller as to the movements of the aircraft.

The PAR Controller did not terminate the approach at the Middle Marker as he had advised the pilot would be done, but rather, continued the approach past the Middle Marker up to a point between the Middle Marker and the end of the runway and instructed the pilot to, "take over and complete your landing visually on Runway 25 Left and if you're not contact execute a missed approach climb west bound to VFR on top."

The Air Surface Radar Detection (ASDE) picked up the Cessna at this point. The Cessna was observed on the ASDE to fly directly above Runway 25 Left for a distance of approximately 3000 feet. The aircraft then made a sudden and violent left veer, making a 210 degree turn with a turn radius of approximately 500 feet and then crashed in the aircraft parking area of the Autonetics Division, North American Aviation Company. There were no survivors from the crash which caused extensive damage to North American facilities and a resulting fire, which severely injured Plaintiff Ivory Combs.

The pilot James Gordon was a businessman in Las Vegas with a total of 668 hours as a pilot in command; he held appropriate licenses from the FAA and was an above average pilot.[1] The pilot had no tendencies towards dizziness, vertigo or any other physical disability which would affect his flying ability. An autopsy revealed no physical ailment which would contribute to or account for the crash.

The aircraft was a new twin-engine 310-G Cessna, well equipped with navigational equipment. There was no evidence of any equipment failure with the exception of some difficulty with an automatic direction finder which is not relevant to the crash.

The Government conceded that there was no evidence of any lack of maintenance or mechanical failure which could have caused or contributed to the crash.

On the afternoon of the crash during the weather period prior to 4:00 P.M., the airport was experiencing weather which necessitated instrument approaches, but which permitted landings to be

---

1. The pilot, James L. Gordon, was a businessman in Las Vegas, Nevada, was married and resided with his family in that city. The Federal Aviation Agency records reveal that he had logged a total of 668 hours as pilot in command; that he held pilot ratings as follows: Airplane Multiengine, Single Engine Land, and Instrument; that, of the total pilot time, 561 hours were accomplished in Cessna 310 aircraft, 182 hours were actual and simulated instrument time of which 43 hours were accumulated in the 90 days preceding the crash. The pilot received his instrument pilot's license on September 22, 1962, following his ground and flight examination by Mr. J. Clair Whitely of Ogden, Utah, who was designated by the Federal Aviation Agency to conduct such tests. Mr. Whitely appeared as a witness in these proceedings and affirmed the contents of his letter of December 21, 1962, written to and at the request of the FAA following the crash in which he recited his observation that the pilot was above average in his judgment, technique and attitude over the course of the examination which consisted of ¾ hour oral examination and three hours of flying. (RT 4244)

made after penetration of the general haze and clouds at a point near the runway.[2] At about 4:00 P.M. a low-lying fog bank began rolling in across the airport as an American Airlines Boeing 707 approached Runway 25 Left. The fog appeared to the co-pilot as a low ground fog, 20 to 30 feet in height.[3] The American Airlines flight executed a missed approach over the field. Approximately ten to eleven minutes later, Gordon made his PAR approach. A PAR approach is conducted by advisories received by the pilot from a radar operator.[4]

2. The source of information as to the weather conditions at or near Los Angeles International Airport is both the weather reported by the weather observers and relayed by the tower controllers, and the weather reported by pilots of other aircraft. The weather bureau observations indicating conditions at the airport itself were taken by a weather observer from a second story level at approximately one-half mile northerly of the east end of Runway 25 Left and were supplemented by a mechanical device near the runway itself, called a transmissometer, which measures obscuration values between two points parallel with the runway electronically. This latter device records, and indicates both in the weather bureau and in the instrument control room of the tower, the simulated distance that is visible down the runway for an approaching aircraft, which distance is termed Runway Visual Range (RVR). In the present instance, the reported weather was given to the pilot from time to time prior to his initiating his approach and the weather values were such as to indicate that an approach for possible landing would have to be made on instruments, i. e. by reference to instrumentation within the cockpit of the aircraft as distinguished from visual reference to outside objects.

On the afternoon in question during the period prior to 4:00 P.M. the airport was experiencing weather which necessitated instrument approaches but which permitted landings to be made after penetration of the general haze and clouds at a point near the runway. However, at about that hour a low-lying fog bank began rolling in across the airport. The nature and location of the fog was described by pilots of other aircraft in the vicinity. Stewart W. McGahan was Captain of a Western Airlines flight in a DC-6B aircraft who testified that he first taxied to Runway 24, a shorter east-west runway on the north side of the airport, but the fog moved in and he then taxied his aircraft to the east, or approach end, of Runway 25 Left at about 4:00 to 4:05 P.M. when the RVR was still below his take off limitations, and held his position awaiting weather improvement since there was enough fluctuation in the forward visibility so that he felt he was warranted in waiting for possible take off. While holding at the end of the runway, the First Officer of the Western flight engaged in a colloquy with a pilot of a TWA Constellation which was similarly holding for take off on his right, some 150 feet away, to the effect that the weather looked "a little rough"—"getting thicker"—which was picked up on the tape recorder of the Los Angeles Tower facility. Captain McGahan stated that at times he could see about one-quarter mile, but forward visibility never achieved a value of 2400 RVR, his required minimums to attempt take off.

3. John A. Templeton and Milton Nielson were the Captain and First Officer respectively of American Airlines Flight 101 (a Boeing 707 having a gross weight of approximately 170,000 pounds) which made an instrument approach to Runway 25 Left at about 4:00 P.M. on December 6, 1962, and, upon reaching an altitude very close to 200 feet, were able to see the approach lights, but having insufficient forward visibility to make a landing, executed a missed approach directly over Runway 25 Left. First Officer Nielson reported his observation of the fog over the runway as: "A low fog on the ground"—"the fog appeared to be 20 to 30 feet or less"—"the fog appeared to be just on the ground obscuring the runway". This aircraft was not in the fog but was above it and the fog appeared to be generally level. Captain Templeton, who had been monitoring his instruments on the approach, looked up from them to see the threshold lights and made the decision for the missed approach and did not contradict his First Officer's evaluation and description of the nature of the fog condition over the runway.

4. When the general weather in the vicinity of an airport such as Los Angeles International becomes adverse, approaches are commonly made by reference to instruments in the aircraft combined with or supplemented by advisories from the radar controller in the tower. The basis for such approaches is the Instrument Land System (ILS) installed and main-

■ It was conceded by the Government that the approach conducted by the pilot was proper and well executed, and that no negligence on the part of the pilot existed during the approach of the aircraft down to the Middle Marker which exists a half mile from the end of the runway and at an altitude of 210 feet along the glideslope; and the Court finds no negligence.[5] But the PAR Con-

tained by the FAA upon the airport wherein a radio beam, emanating from a point on the ground at the touchdown point on the runway, travels up and out along the approach course to the runway at a constant angle of three degrees. The ILS beam or glideslope is utilized in two ways: first, by using radio navigation instrumentation in the aircraft, the pilot can determine at any particular time his relative position to the glideslope vertically and horizontally; second, the tower radar operator, by observing the radar return on the radarscope upon which the line of the glideslope is etched, can determine the relative position of the aircraft to the glideslope as well as its distance from the point of touchdown.

A full radar approach or precision radar approach such as was being utilized in the instant case is one where the primary reliance for information as to the position of the aircraft is placed upon the radar controller and in which the pilot flies the plane without visual reference, relying upon his flight instruments in his maintenance of the proper *attitude* of the plane and relying upon and following the directions of the controller in his maintenance of the proper *course* of the plane down the glideslope to a point where visual reference to the runway can be had, where he "takes over visually" and completes a landing.

5. Under such conditions, the FAA has by regulation set up certain minimum conditions under which a pilot may proceed with attempting a landing after making the approach. These minimums for this runway at Los Angeles were set at "200 and one-half", i. e. upon reaching an altitude of 200 feet, the pilot must then have one-half mile of forward visibility in order to proceed with a landing. An exception to the altitude portion is made under certain conditions by 14 Code of Federal Regulations (C.F.R.) Section 609.4(g), in effect on December 6, 1962, wherein it is provided that the pilot may descend an additional fifty feet if he is clear of clouds but may not descend lower than that unless he has reached a point from which a normal approach can be made to the runway, and either the approach threshold of the runway or the approach lights or other markings identi-

fiable with the runway are clearly visible:

"No aircraft, after reaching an altitude equal to the minimum altitude for landings specified in these regulations, will descend below such altitude unless it is clear of clouds and thereafter, except when landing minimums equal to or higher than 1000–2 are authorized, the aircraft will not descend more than 50 feet below such altitude unless (1) it has arrived at a position from which normal approach can be made to the runway of intended landing, and (2) either the approach threshold of such runway or the approach lights or other marking identifiable with such runway are clearly visible to the pilot."

See also Exhibit 1 referred to by Witness Burke:

"Descent below 326 MSL (200′) shall not be made unless visual contact with the approach lights has been established or the aircraft is clear of clouds."

The Regulations further provide that:

"If, at any time, after descent below the clouds, the pilot cannot maintain visual reference to the ground or lights he will immediately execute the appropriate missed approach procedure prescribed in the regulations in this part."

This may very well have been the factual situation here at least in the opinion of an experienced pilot, witness David Irvine, who stated in answer to a question on cross-examination:

"A I think from which I have heard in the extensive time I spent here in the courtroom that he very likely was clear of clouds down through probably down to his minimums.

"Q You assumed, then, that he was free of clouds at 200 feet and was entitled to go down for an additional 50 feet?

"A I would assume so." (RT 4367)

Having reached the minimum altitude and not being in contact with the runway, it then becomes the duty of the pilot to execute a missed approach. 14 C.F.R. 609.15(a), effective December 6, 1962:

"A missed approach will be initiated at the point where the aircraft has descended to authorized landing minimums at a specified distance from the facility if visual contact is not established, or if the landing had not been accomplished,

troller because of information available to him through the Local Controller

knew, or should have known, that the fog was becoming thicker at the approach

or when directed by Air Traffic Control."

There is no clear evidence that the pilot violated a regulation by going below minimums since, if he did not go into clouds or fog, his altitude, as such, whether it was 50 feet or some other value less than 200 feet, would make no difference. Testimony of Defendant's witness, Mervyn A. Davenport:

"The Court: And you do not know how high the fog was at the time this missed approach was made or the time Gordon came in?

"A No sir, I did not know the exact amount. I knew the type of fog and the type of condition that existed, but not the exact height of the fog.

"Q And you have not heard the deposition of Captain Milton Nielson of American Airlines, have you?

"A No, Sir.

"Q To the effect that the fog would have been about 60 or 70 feet high and level?"

(Actually, Captain Nielson testified 20 or 30 feet (RT 414)):

"A It is possible?

"Q If it was that high and only that high and level and the pilot stayed above it, he never did go below his minimums, did he?

"A No, Sir.

"Q If he never went into the clouds?

"A No, Sir." (RT 2657–2658)

The approach made by the pilot in this instance was within the safety limits with respect to the glideslope presentation. Testimony of witness Gerald Feltman:

"Q One other statement, I think this was said several times in the deposition, Mr. Feltman, when you were asked about this approach made by the pilot, and did you not state that he was within safety limits at all times?

"A Yes, I did.

"Q That was stated on several occasions, and you do not back off from that now, do you?

"A No. (RT 3140)

And the approach was skillfully executed. Testimony of witness Vance Breese:

"Q And from the corrections that you heard given to the pilot on this particular approach, and the approach in general, have you formed an opinion with respect to the quality of that approach?

"A Yes, Sir.

"Q And what is that opinion?

"A That it was either an unusually skillful approach for the businessman

pilot or it was an automatic approach controlled by the automatic pilot and the approach coupler.

"Q Now there were certain corrections given of 25 feet, 15 feet, I think even as far as 100 feet. Do those corrections denote to you as an experienced pilot any lack of ability on the part of the pilot who was flying the plane?

"A On the contrary, they showed an unusual amount of skill." (RT 497)

And defense experts agree it was successfully completed. Direct examination of John McCormick:

"Q Have you an opinion as to whether reconstructing—have you an opinion as to whether or not that approach, the PAR approach, as it is known to you as a pilot, and based on your experience as to what you would expect of a pilot running PAR approaches, as to whether or not it was successfully completed?

"A It was successfully completed.

"Q I will ask your opinion as to whether or not the PAR approach, that is, at that phase of this case in the sequence of the events, had anything to do with the actual crash?

"A In my opinion it did not." (RT 3833–3834)

\* \* \* \* \*

"The Court: If I understand you correctly, you feel up to the middle marker he was prudent; is that your answer?

"The Witness: That's correct. I wouldn't argue with it." (RT 3857)

At a point on this approach approximately three miles from touchdown the controller transmitted the latest weather advisory to the pilot which indicated that the ceiling was zero and that the visibility was zero with fog and asked if the approach would be continued, and the pilot replied, "Put me right down on the runway." Expert pilot witnesses in the trial of the case have agreed to the propriety of the continuation of the approach. Testimony of witness Elwin D. Sullens, by Government counsel on cross-examination:

"Q As a matter of fact, and I am addressing this to you as a prudent pilot, if three miles from touchdown you received a latest weather report of ceiling zero, sky obscured, visibility zero with fog, wouldn't you discontinue your approach at that point if you had an alternate airport that was clear to land, like Burbank?

"The Witness: I would probably go to my minimums.

end of Runway 25 Left, making this thickening fog condition reasonably foreseeable with the result that his failure to advise the pilot thereof was negligence.[6] The PAR Controller admitted that the two conditions necessary to bringing into operation Regulation 344.9 of the Air Traffic Control Procedures Manual (Clerk's Transcript, hereinafter referred to as "CT", Exhibit 17) were present:

1. Plane below safety limits; and

2. Controller's judgment that safety of the flight was likely to be in danger.

The directive requires the PAR Controller to use the following express terminology of Section 394.7 set forth in the Air Traffic Control Procedures Manual:

"To instruct a pilot to discontinue approach when the aircraft exceeds safety limits: IF RUNWAY NOT IN SIGHT, CLIMB IMMEDIATELY TO (altitude), TURN LEFT/RIGHT, HEADING (degrees), (Reason and further clearance, if appropriate), ACKNOWLEDGE."

Nevertheless, in violation of this directive, the PAR Controller gave the following advisory (Plaintiffs' Exhibit 4A, p. 9):

"[T]ake over and complete your landing visually on runway two five left if you're not ah contact execute a missed approach climb westbound to VFR conditions on top."

The pilot was thereby advised to take over visually, complete his landing, and if the runway was not in sight, to execute a missed approach.

The pilot then apparently began to execute a missed approach and add full power, proceeding down the runway for 3000 feet, at which time the aircraft performed an extremely violent maneuver in a left bank with a turn radius of 500 feet, executed a turn of 210°, and crashed in a steep left bank, nose down. The final maneuver involved a turn so tight as to be beyond the control capacity of the aircraft.[7]

"Q You would go down to your minimums?
"A Yes.
"Q And then you would go down to your minimums for a look see to see what you had?
"A Right." (RT 314)
Direct examination of John McCormick, Air Carrier Operations Inspector for FAA:
"Q Mr. McCormick, does the term "look-see" privilege in terms of the pilot's sight, given zero zero weather with fog, RVR less than 1000, at a point before he reaches the middle marker, does that have any meaning to you?
"A Yes, this was privilege, if you will, given to enable a pilot because of some inaccuracies in our visibility reporting system, as far as actually what is occurring on the runway, to fly an approach to his minimums, even though the weather was reported below minimums, to take a look at the situation."
(RT 3811, 3812)
And Government counsel has frankly admitted to the Court during the course of the trial that there was no claimed fault or negligence of the pilot in making and continuing this approach:

"The Court: I don't think the Government contends he was wrong in coming down to the point of going off the blip.
"Mr. Fareed: He had the right to take a look-see. He had the right to come down and see if he had his minimums. To that point, he had that right. Beyond that point I think the Government's evidence will show—and it is our position—that the conduct of his flight was negligent." (RT 877)
* * * * *
"Mr. Fareed: We say the pilot's negligence and error occurred at the point of the last PAR transmission. 'Take over and complete your landing visually.' That is the point at which we say it starts. Our evidence will be consistent with that position, I think." (RT 879)

6. RT Vol. 2, pp. 5–7; 1134–1140.

7. The final maneuver of the aircraft was one in which it left the course over Runway 25 Left and made a steep left turn which ended in its being observed by the witness, Elwin Sullens, coming down into the Autonetic's parking lot in a 60 to 70 degree left bank and nose down at about

■ There exists a phenomenon known as wing tip vortices. When a heavy aircraft flying at slow speed accelerates, the passage of the wings

45 degrees (RT 287) on a heading close to 70 degrees. (RT 285) The point at which the crash occurred is approximately 1000 feet south of Runway 25 Left (see Exhibit 8A). In order to reach the point of crash and the heading at the time of crash, the aircraft would necessarily have proscribed a turn of approximately 210°.

Witness Vance Breese, whose background and experience in the field of aviation are almost legendary, having commenced his flying in 1916 and thereafter pursuing a career in aviation that encompassed flying the air mail in the 1920's, the design and manufacture of the several types of airplanes, participation in early airlines, and engineering and test flying for the major aircraft manufacturers in the United States, testified:

"Q Now, Mr. Breese, from your experience and knowledge of flying and in your knowledge of the Cessna 310–G and its capabilities, do you have an opinion with respect to this turn that was made as to whether or not it exceeded the aircraft capability under normal pilot control?

"A Yes, I have an opinion.

"Q What is your opinion in that regard?

"A That the airplane could not under normal manipulation of the controls by a pilot of normal experience make such a turn.

"Q Now, do you have—what are your reasons for that, sir?

"A The airplane turned very sharply, very abruptly. The rate of turn apparently increased very rapidly, because the airplane made a total turn of about 210 degrees in a distance that would have imposed structural loads on the airplane to a point at least of discomfort to the passengers, and it could have been an exceedingly dangerous maneuver even in clear weather.

"Q In your opinion was this a pilot controlled maneuver?

"A No, sir, not at all." (RT 536–537)

The witness went on to relate his opinion as to the cause of the violent and abnormal manuever of the aircraft:

"A Yes, I have an opinion which, based upon the fact we were unable to determine any cause, either mechanical or human in the action of this airplane, that the rapid roll and the crash could only have been caused by an external agent and I know of no external agent except the tip vortices generated by the preceding airplane's missed approach." (RT 543)

Plaintiff witness Gerald Mills, whose qualifications include degrees in aeronautical engineering and mechanical engineering from California Institute of Technology and pilot experience since 1932, including experience in Flight Research Branch at Wright Field, Dayton, Ohio, also expressed an opinion on the subject:

"Q Mr. Mills, there has been testimony in this court that on the date in question the Cessna 310–G flew a distance of 3000 feet straight in a generally westerly direction along 25L Los Angeles International and then suddenly began to make what would be a left hand turn and did accomplish a 210 degree turn within a diameter of approximately 1000 feet. Now, I ask you whether this particular maneuver with this particular aircraft could have been induced by normal pilot handling?

"A This is not a maneuver you would normally do. You would normally—if you tried it you would pull the wings off the airplane.

"Q So it is your testimony, then, that this is an abnormal maneuver of this aircraft?

"A Yes." (RT 4164)

And later went on to explain his opinion as to the cause of the maneuver:

"A It was caused by something other than the pilot, some meteorological phenomenon other than the pilot.

\* \* \* \* \*

"Q What is your opinion as to the cause of this crash?

"A I believe that airplane was tipped up on its wing by going through the path of the vortices and it went in because of that.

"The Court: When you say it went in, do you mean crashed?

"The Witness: Yes, Sir." (RT 4173)

Plaintiff's last witness in the case, David Irvine, whose qualifications as a pilot expert witness have been reviewed above, also rendered an opinion with respect to the maneuver:

"Q You have heard the testimony in evidence with respect to the diameter of that turn?

"A Yes, sir.

"Q With your familiarity with the Cessna 310 and your knowledge of the flying characteristics of that airplane, do you feel that it is physically, within the cockpit, such a turn as would be done accidentally?

"A No, I do not.

through the air causes a roll-up of the air mass at the tip of each wing. The air mass continues to swirl much in the same manner as a tornado, except that its position in the air is horizontal. The force of the resulting tornados is proportional to the weight, wing span and speed of the aircraft. The advent of heavy aircraft in the field of aviation has caused increased recognition of this phenomenon. The size, weight and acceleration of a Boeing 707 is such as to create a violent disturbance in the air. The duration of this phenomenon is regulated by several factors, the most important of which is the type of wind condition extant. A relatively slight wind condition facilitates the preservation and endurance of wing tip vortices over the runway. The ideal conditions for the preservation of violent vortices were present at the hour of the crash. It was the opinion of two experts that the immediate forces acting upon the violent final maneuver of the Cessna were the violent wing tip vortices shed by the American Airlines Boeing 707 which had executed a missed approach previously. The Court agrees with these opinions and finds that the effects of wing tip vortices provide the most reasonable explanation for the violent final left bank maneuver.

The advent of the modern heavy transport type aircraft has brought with it a phenomenon which was unknown to the early decades of the aviation industry. General knowledge of the subject is so limited that, even during the course of this trial, a Government pilot witness, John McCormick, with flying experience of 25 years in which he accumulated 13,000 hours flying time, equated it in severity as something less than "prop-wash" occurring behind a propeller driven aircraft. (Reporter's Transcript [hereinafter referred to as "RT"] 3712).

However, the nature of vortices created by the roll-up of the air mass at the tip of each wing on a heavy transport aircraft operating at low speed, maximum lift situations in landing, take off, and missed approach configurations around the airports and the consequent hazard to light weight private aircraft, have been the subject of knowledge and study by the FAA for a number of years. E. g., see the legislative history of the "caution turbulence" warning requirements of the Air Traffic Control Procedures Manual set forth in Furumizo v. United States, 245 F.Supp. 981, 1002–1011 (D.Hawaii 1965).

With the possible exception of Mr. McCormick, there was uniform recognition among the witnesses in this trial that the phenomenon exists:

Plaintiff witness,
Vance Breese (RT 538);
Defense witness,
Edmund Burke (RT 988);
Defense witness,
James Nimmo (RT 1193);
Defense witness,
A. Bill Bush (RT 168);
Defense witness,
Merle Nichols (RT 2070);
Defense witness,
Gerald Feltman (RT 3344);
Defense witness,
Edgar Zwiebach (RT 2273);
Plaintiff witness,
Anthony LeVier (RT 4141);
Plaintiff witness,
Gerald Mills (RT 4165).

"Q Do you feel that it is the kind of a turn that could be done unintentionally?
"A No, sir, I do not.
"Q Do you have an opinion as a pilot as to whether or not it is the type of a turn which would be made by a pilot who was duly qualified to fly instruments?
"A No, it certainly would not be.
"Q Do you have any opinion as to whether or not this is actually within the physical capabilities of the aircraft?
"A It is not within the maneuvering capabilities of the airplane, no.
"Q Do you have an opinion with respect to the possibility of this maneuver that has been described being in controlled flight by the pilot?
"A It could not have been, in my estimation, in controlled flight." (RT 4345)

Certain qualities of the turbulence created by wing tip vortices appear to be accepted with little or no question or controversy:

(a) *That the resulting forces can exceed the load factors and control capabilities of light aircraft.*

Testimony of witness Breese:

"Q Can this roll or the forces that are exerted exceed the normal load factors of a light aircraft?

"A Yes, this was depicted in the picture.

"Q Can they exceed the controllability of the pilot of a light aircraft?

"A Yes, it can exceed the controllability of the airplane itself, regardless of what the pilot does."

NASA Technical Note D–829 (Exhibit 48), p. 1:

"The results indicate that light airplanes traversing the wakes of currently operational heavy transport airplanes can experience loading conditions that exceed the design limit and, in some cases, the design ultimate load factors."

Exhibit J of Defendant, p. 23 (Script for FAA turbulence film):

"The air in the outside layer can rotate at speeds greater than thirty-five miles an hour. That's enough to put a light aircraft completely out of control—or even cause structural failure."

NASA expert, John A. Zalovcik (RT 2211):

"The Witness: If an airplane gets in the core, especially if the age of the vortex is low, it could rotate, yes, sir."

ATS Bulletin dated 11–15–62, published by FAA:

"Light aircraft crossing the wake of a heavy aircraft at any altitude can be structurally damaged."

(b) *That the weight factor of the generating aircraft has a direct bearing upon the strength of the vortices created.*

Defendant's Exhibit J, p. 13:

"So the heavier the aircraft, and the greater its load, the worse the turbulence will be."

Testimony of FAA employee, James W. Nimmo (RT 1195):

"Q Are you also aware that the intensity of a vortex or the so-called wing tip vortices has been said to be directly proportional to the weight and inversely proportional to the speed of an aircraft that is, in this case a 707?

"A Yes.

"Q And that the heavier and slower the aircraft the greater the intensity of the vortex in the vortex core?

"A Yes.

* * * * * *

"Q You are aware of the effect of weight and speed of an aircraft in a given maneuver in terms of how it affects the intensity of the vortices created?

"A Well, yes. Yes.

"The Court: Do I understand now you say it is directly proportional to the weight and speed?

"A Directly proportional to the weight and inversely speed. In other words, the heavier the aircraft and the slower the aircraft is going the more intensity."

NASA witness, John A. Zalovcik (RT 2240):

"The Court: And these jets with their small wing span have a tendency to set out more powerful vortices than the motor driven DC–6B with a bigger wing span?

"The Witness: That is correct, yes, sir.

"The Court: Because as you said it is inversely proportional to the wing span?

"The Witness: Yes, sir.

* * * * * *

"The Court: I want to know what you think. I would gather it would

make some sense, that is assuming his rule of thumb is correct for a DC–6B, that the rule of thumb ought to be 12½ minutes for a 707; is that correct in your best judgment?

"The Witness: Yes."

A factual controversy arose among the witnesses in the trial which centered around the length of time that the wing tip vortices could persist as a possible hazard to a light aircraft. The factual position upon which the controversy arises is, of course, the separation time between the missed approach of the American Airlines Boeing 707 and that of the Cessna between ten and twelve minutes later together with the requirement of the Air Traffic Control Procedures Manual that a warning be given of possible turbulence. Resolution of the controversy requires analysis of the testimony of the various witnesses on the subject which might well be done in the order of their appearance at trial.

In addition to his general background in aviation, Mr. Breese related his investigation of the subject matter of vortices which included an examination of all the prominent literature on the subject, a list of which was presented to the Court and marked for identification as Exhibit 53. The witness' approach to the subject admittedly did not rely upon scientific formulae or computations but was in the nature of an empirical approach drawing upon his own background and experience and that of other flyers. Taken into consideration was a complete investigation of the facts of the instant case by an aviation accident investigator to whom the basic elements were the pilot, the machine, and their environment. The results of that investigation are evident in this trial wherein: the pilot must be found to be qualified and in exercise of reasonable prudence; aircraft malfunction is not an issue; and the only element of the environment which would furnish a cause for the crash is the lingering vortices from the Boeing 707. From there the witness proceeds to evaluate this most prominent possibility and explore the conflict between the theory espoused by the scientists, epitomized in this case by witnesses Zalovcik and Zwiebach, and the actual experience of the pilots in the field. From there it became a problem, as it does in this case, of evaluating the rationale for the opinions of the scientists.

(c) The formula being utilized by the scientists to reach the theoretical time value had admitted limitations.

A review of the testimony and cross-examination of John A. Zalovcik in RT Vol. 13B, clearly reveals that the formula utilized by him in his calculations was "developed in the late 1800's for the free flow of gas [in] the gas mains of Europe" (RT 2189); that "one portion of the formula is a variable portion of that formula" (RT 2190); that at least one parmeter, small scale velocity at any given time and place, is unknown and a theoretical value is ascribed to it (RT 2201); that the determination by the formula of the persistence of vortices is "subject to the vagaries of the atmosphere at a particular time and place" (RT 2204); and that by changing the formula, results could be obtained corresponding to reports of pilots of encountering turbulence at separation times in excess of five minutes. (RT 2246) And, similarly, examination of the testimony of Edgar L. Zwiebach, the other Government scientist witness, shows that in his work on the subject he simply utilized the same formula that had been used by Dr. Bleviss in 1954 and by the witness, Zalovcik (RT 2287); and he likewise admitted that, by modifying the one unknown factor, he could reach results compatible with pilot reports:

"Q Well, there is one NASA report, D–1777, in evidence here as Exhibit 49. I read to you from page 7: 'It should be noted that pilots have reported apparent encounters with trailing vortices at separation times estimated at 5 minutes or more.' My question to you, sir, is whether in using the

formula which you adopted and the one upon which you base your testimony today that this would be almost incredible, these reports of over 5 minutes?

"A Not incredible, but questionable.

"Q However, you could, could you not, modify the formula, that is, the one variable, to a point where they would be reasonable?

"A I believe so, yes.

"Q Similarly, you could do so with a 10-minute interval if you had a pilot report of 10 minutes?

"A Possible.

"Q Well, now, insofar as reaching the theoretical result with a modification of the formula, that isn't just a possiblity, you could do that, couldn't you?

"A Yes." (RT 2294)

(d) The longest actual measurements of vortices at the point of greatest velocity, i. e., take off, landing and missed approach configurations, has been less than 2 minutes. Again, in Mr. Zalovcik's testimony, there was discussion of certain tests that had been made for periods longer than 2 minutes but these were made at high altitudes where the generating aircraft were flying straight and level and not exerting maximum lift as would be the case in the problem area. (RT 2198) The only tests he knew of below 300 feet altitude were made by Mr. Zwiebach and in the Dynascience contract, the latter not having been completed at the time of his testimony. (RT 2199) Insofar as the Zwiebach measurements are concerned, Mr. Zwiebach himself testified that he monitored eight take offs and was able to record six of these (RT 2284), that his theoretical calculations varied as much as 50% from actual velocities measured, and that the longest time lapse measured was 65 seconds.

(e) There is admitted uncertainty as to the validity and applicability of the formula to actual conditions. At least one of the reports relied upon by Mr. Zalovcik (RT 2181, 2183), and listed as Reference No. 6 in Mr. Zwiebach's report, contains the statement that "vortices may persist for period of 30 minutes or longer depending upon their initial strength" (Quoted from Kraft report of March, 1955 by Government counsel) (RT 2183) Witness Zalovcik, despite his apparent certainty on direct examination, appeared to believe on cross-examination that there were uncertainties (RT 2246):

"Q And similarly, if people appeared in this courtroom, actual pilots, testifying to an actual experience, where they had encountered turbulence from 2½ to 6½ minutes, on your drawing board using your formulas that would be impossible, wouldn't it?

"A I wouldn't say so, no, because as I say theoretically the vortex would exist to infinity; and, depending on the type of airplane that you had, why you would have different responses."

And witness Zwiebach appeared somewhat reluctant to mix the theoretical with the practical (RT 2289):

"A No. First of all, I would like to say that by virtue of my work I feel competent in discussing the existence or strength of vortices but not particularly competent in the field of predicting upsets of light aircraft, which is what your questions presupposes."

Both Government scientist witnesses admittedly used and relied upon the Bleviss 1954 report, and Mr. Zalovcik agreed with the following statement from page 3 of that report (RT 2205):

"Because of the many factors involved and because much of the required data would not be known in any typical situation, no detailed rules can be set up which will allow pilots of light planes to avoid difficulties under all conditions."

But he disagreed with Dr. Bleviss' statement in that report that:

> "Particularly important is the fact illustrated in Fig. 12 that even after 5 minutes the effects of viscosity have increased the core radius less than one foot. Since the typical light plane has a [span] of 30 feet or more, it is clear that viscosity cannot produce any noticeable reduction in the induced effect on the light plane for any reasonable separation time." (RT 2206)

And, although Mr. Zalovcik was willing to agree with the efforts of his fellow scientist, Dr. Bleviss, to come up with a rule of thumb for use in the field (RT 2221), he was unwilling to accept the resultant figures because it did not take into account one further parameter known as "in ground" effect. (RT 2222) Yet he himself admits that the vertical and lateral movement of the vortex core is affected by its encompassing air mass; that the fact of whether it might settle toward the ground or move laterally at any given time is dependent upon the movement of such air mass (RT 2217); and that, again, his calculations with respect to such movements of the vortex were purely theoretical and no actual measurements have ever been made. (RT 2218)

(f) Some areas of the "scientific theory" tend to verify the practical experiences reported.

In the report of Dr. Zigmund O. Bleviss, also done under auspices of Douglas Aircraft, there is the recommendation of a 5 to 10 minute separation time under certain conditions. As pointed out above, this recommendation was made upon the basis of the generating aircraft being a DC–6B weighing 60,000 pounds. The Government witness, Zalovcik, has admitted the 25% increase in velocity of the vortex brought about by the 170,000 pound weight of the Boeing 707, which would appear logically to extend the rule of thumb separation time to 6 to 12½ minutes under similar conditions. Such a separation time would encompass the pilot reports which NASA and FAA have been receiving that upsets from turbu-lence are being experienced at periods beyond 5 minutes as well as the court-related experiences of Plaintiffs' witnesses, Anthony LeVier and Ronald Madley. Plaintiffs' witness, Gerald J. Mills, who testified on this subject, in addition to impressive qualification as an aeronautical engineer, is a pilot of some 25 years experience, is familiar with the evolvement of the scientific formula used by the other engineers, has performed tests with respect to the subject of persistence of vortices and yet is of the opinion that it was turbulence from the 707 vortices which tipped the Cessna upon its wing. The testimony of Mr. Mills would appear to put the "theory" of the scientific group in its proper perspective—the use of the modified potential flow formula for determining the persistence of vortices was and is a hypothesis which has not attained evidentiary credibility sufficient to become a sustainable theory on the subject.

Thus it is that, faced with the admitted limitations on the formula being used, the paucity of actual measurements to support its results, the admitted uncertainty as to its applicability to actual conditions, and finally the division of opinion in the scientific group, one could reasonably and logically disregard the scientific hypothesis in favor of reported experiences and rules-of-thumb which bear out the reports.

The foregoing has reviewed the testimony of the major witnesses relating to the persistence of vortices. However, a number of others discussed the subject to some degree.

The Air Traffic Controller group, consisting of Edmund Burke, the specialist from FAA headquarters in Air Traffic Service, Merle H. Nichols, Assistant Chief Los Angeles Tower, and Gerald J. Feltman, the PAR Controller of the subject flight, testified pretty well along the same line. Prior to 1963, none of them, nor any of the FAA controllers, received any instruction with respect to the origin and persistence of wing tip vortices. None of them was aware of specific instances of turbulence affecting

the flight of light aircraft in their experiences as controllers. With respect to giving or not giving turbulence warning to following aircraft, all of the FAA controllers followed the separation times required by the Instrument Flight Rules and the Visual Flight Rules, hereinafter referred to as "IFR" and "VFR" respectively.

The Government pilot witness group consisting of Mervyn A. Davenport of Gunnell Aviation, Cyril Tanner of Long Beach, James W. Nimmo, the script editor for the FAA turbulence film, and John McCormick, the FAA Air Carrier Operations Inspector, were consistent in their testimony that none had personally experienced turbulence from vortices and that they did not believe vortices caused the crash of the Cessna. With the possible exception of Mr. Nimmo, none professed to have made any study of wing tip vortices, or its effect upon light following aircraft. With respect to Mr. Nimmo, he had read a number of the vortices reports but did not hold himself out to be "an expert or represent here that you have any expertise in terms of mathematical calculations or precise research in the area". (RT 1198) Mr. Nimmo, as the FAA editor of the script of the Wake Turbulence film was responsible for language such as:

"So the heavier the aircraft, and the greater its load, the worse the turbulence will be"

and, having admitted to study of the Bleviss report (RT 1197), he must be assumed to have known that the recommended separation time therein for light planes following a DC–6B should be extended for the jet transports three times greater in weight:

"Wake turbulence may remain severe in excess of five minutes."

And, having admitted to having studied the NASA reports, he must have been aware of the fact that NASA was receiving such reports from pilots (Exhibit 49, p. 7):

"Controllers—caution pilots whenever wake turbulence is suspected to exist."

From which it seems safe to assume that Mr. Nimmo was not aware that the FAA practice with respect to turbulence warning was and is based on IFR-VFR spatial separation rather than upon elapsed time between the lead and following aircraft.

Upon all the evidence it is clear to the Court and we necessarily find that the final maneuver of the Cessna was physically beyond the control capacity of the aircraft, and could only have occurred as the result of something other than the aircraft. Upon the evidence in this case, the effects of wing tip vortices were the only outside force acting upon the aircraft.

The Plaintiffs presented four theories of liability—two based on ordinary negligence, and two based upon liability resulting from the violations of the safety regulations by the Government. The Court finds in favor of the Plaintiffs and against the Defendant upon each theory.

*FIRST THEORY OF LIABILITY: The PAR Controller Was Negligent In That He Knew, Or Should Have Known, That A Hazard Existed In The Form Of Wing Tip Vortices From The Prior Missed Approach Of The Boeing 707, And Breached His Duty To Warn The Pilot Of This Hazard.*

■ When the United States has undertaken to warn the public of danger and induces reliance thereby, it must perform the risk with due care. Indian Towing Company v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48, 53 (1955).

■ This rule is applicable to the Federal Aviation Administration. United Air Lines, Inc. v. Wiener, 335 F.2d 379, 396 (9th Cir. 1964); Hartz v. United States, 387 F.2d 870, 873 (5th Cir. 1968).

■ This rule has express application with respect to the necessity of warning pilots concerning the existence of wing tip vortices. Furumizo v. United States, 245 F.Supp. 981 (D.Hawaii 1965), aff'd 381 F.2d 965 (9th Cir. 1967); Hartz v. United States, supra.

■■ While it does not appear that the Air Traffic Control Procedures Manual was ever published in the Federal Register in a manner required to give it the force and effect of law in all respects, nevertheless it does have the force and effect of law in governing the FAA. As was held in Hartz v. United States, supra, 387 F.2d at 874, the PAR Controller must follow the Manual. It is the "Bible for Tower Operators." United States v. Miller, 303 F.2d 703, 710, fn 16 (9th Cir. 1962), cert. denied 371 U.S. 955, 83 S.Ct. 507, 9 L.Ed.2d 502 (1963); Franklin v. United States, 342 F.2d 581, 585, fn 1 (7th Cir. 1965), cert. denied 382 U.S. 844, 86 S.Ct. 51, 15 L.Ed.2d 84 (1965).

Moreover, it is expressly provided in 14 C.F.R., Sec. 26.26 as revised January 1, 1961, that the Air Traffic Control operator *shall* control traffic in accordance with the appropriate air traffic control manuals:

"A certificated air traffic control tower operator *shall* control traffic in accordance with the procedures and practices as prescribed in the appropriate air traffic control manuals of the Federal Aviation Agency to provide for the *safe*, orderly and expeditious flow of air traffic in accordance with the following requirements: * * * " (Emphasis added.)

While the effects of wing tip vortices are not widely know or widely understood, the FAA was thoroughly familiar with the existence of the hazard from wing tip vortices. Many studies had been conducted in this field and these studies had been examined by the FAA. In addition, the FAA had conducted their own research in this field. It was, in fact, as a result of these studies that specific regulations were enacted by the FAA relating to the warnings which should be given concerning the hazards of wing tip vortices. These regulations are set forth in Section 411.7 of the Air Traffic Control Procedures Manual. The history of the events leading to the adoption of these regulations is set forth at length by the District Judge in Furumizo v. United States, supra. As a result of these studies, a rule of thumb was formulated for a safe separation time when a DC–6B has executed a missed approach. That rule of thumb was found to be from 5 to 10 minutes.

But a rule of thumb effective for a DC–6B would not be effective for a Boeing 707, which is almost three times as heavy as a DC–6B. The FAA was well aware that the severity and duration of wing tip vortices increases directly with the increased weight of the aircraft producing the vortices and the FAA knew, or should have known, that a safe separation time between a Boeing 707 and a light plane under the conditions productive of severe turbulence would be 12½ minutes. This was conceded by the expert witness for the Government, John A. Zalovcik, in examination by the Court:

"The Court: I want to know what you think. I would gather it would make some sense, that is assuming his rule of thumb is correct for a DC–6B, that the rule of thumb ought to be 12½ minutes for a 707; is that correct in your best judgment?

"The Witness: "Yes." (RT 2229)

■ The Defendant argues that the individual PAR Controller here involved, whose duty it was to warn of the existence of turbulence, was not aware of the knowledge possessed by the FAA. The short answer to this is that the hazard of wing tip vortices turbulence was and is a clearly foreseeable hazard which the PAR Controller should have known, not only by virtue of the nature of the hazard itself, but also by virtue of his training and experience as well as the duty of the FAA to communicate its knowledge of the hazard to him as one of its agents.

*SECOND THEORY OF LIABILITY: The PAR Controller Was Negligent In That He Gave A Series Of Misleading, Confusing, Improper And Unduly Deferred Advisories To The Pilot.*

During the approach, the PAR Controller advised the pilot that the approach would be terminated at the Middle Marker, which was a half mile from touch-

down (at an altitude of 210 feet).[8] Later in the approach, the Controller advised the pilot that he had "passed" the Middle Marker without advising the pilot as to when he had passed the Middle Marker or *how far* past the Middle Marker the pilot was.

■ Section 300.1 of the Air Traffic Control Procedures provides:

"Radar facilities shall provide radar service to IFR aircraft to the maximum extent practicable, consistent with workload, communications, and equipment capabilities." (Exhibit 17, p. 3–1)

That provision has been interpreted to obligate the PAR Controller to provide service to the pilot as long as he had a target in sight on the radarscope. (RT 854) The precision radarscope could get a return from a target west of the Middle Marker up to the point of touchdown, assuming no problem with ground clutter. (RT 1947–1948) The PAR Controller could follow the target all the way down over the threshold if the pilot was on glide path and on course. (RT 1949) It was normal to give advisories west of the Middle Marker until the point where the controller could not see the target. (RT 2063) The instructions to PAR Controllers were deemed conflicting, in that the NOTAM instructed that the PAR service should be stopped at the Middle Marker and the Air Traffic Control Procedures Manual instructed that the radar tracking and PAR advisories be continued as long as possible. (RT 3964; 3968–3969) The Air Traffic Control Procedures Manual was not recommended for the training of pilots. (RT 1336)

The PAR Controller who conducted the fatal approach interpreted Section 300.1

---

8. The three mile azimuth portion of the precision radarscope had an inherent problem at the Los Angeles tower arising from permanent radar echoes which returned as a row of little dots fused together at the narrow left-hand corner of the radarscope, and which rendered it difficult to see a moving blip and which was known as ground clutter. (RT 166–167; 2017; 3952). The FAA conducted engineering tests and reduced the intensity of the ground clutter, but some of the controllers were reluctant to assume the responsibility for issuing PAR advisories to light aircraft as the aircraft's target moved through the ground clutter on the radarscope. (RT 3951–3952; 3970–3971) On September 7, 1962 the FAA authorized the issuance of a Notice to Airmen, or NOTAM. (RT 3727, 3732, Exhibit AA) 14 C.F.R., Section 609.4(b), effective December 6, 1962, in its pertinent portion states: " * * * [W]hen unforeseen conditions are encountered in the establishment, realignment, or operation of the navigation facilities upon which the approach procedures are based, it may be necessary to accomplish without delay, a change in the published instrument approach procedures. Notices of such changes are disseminated by 'Q' codes and Notices to Airmen. Therefore, any person who intends to conduct an instrument approach shall check such notices to determine whether a change has been made in the pub-

lished instrument approach procedures."
The first publication of the NOTAM occurred on November 6, 1962. (RT 3732–3733, Exhibit F) A copy of the NOTAM was sent to the Los Angeles tower and the NOTAM was deemed binding on controllers. (RT 1038; 3951; 3958–3959) The NOTAM stated:

"Los Angeles International Airport Tower, PAR (Runway 25L) minimum ceiling 200 feet; visibility one-half mile; PAR unusable, west of ILS middle marker for aircraft below 12,500 pounds GWT on account of ground clutter." (RT 31)

The Cessna 310–G was less than 12,500 pounds. (RT 78) The rationale underlying the NOTAM was that the PAR Controller must be able to see the target down to the assigned PAR minimum so ground clutter should not be possible before the minimum. (RT 1055) The NOTAM in essence told the PAR Controllers to stop giving advisories at the Middle Marker and notified pilots that the PAR service would be stopped at the Middle Marker, and it did not tell the PAR Controllers that they could continue the service west of the Middle Marker if they desired. (RT 3962) It became a customary practice for PAR Controllers to state that the approach would terminate at the Middle Marker. (RT 82)

of the Air Traffic Control Procedures Manual as an overriding obligation requiring him to give every bit of radar service he could give to the pilot. (RT 3268–3269) Therefore, he continued to communicate to the pilot after the aircraft had passed the Middle Marker. (RT 3120). He followed a practice whereby he could continue to give advisories as long as the target was free of clutter, even right down to touchdown, although normally a PAR Controller turns the aircraft loose over the runway threshold. (RT 3679; 3959) He claimed that his initial advisory, "[T]his approach will be terminated at the Middle Marker," was given, because he had no way of knowing whether or not there would be ground clutter problems with respect to this particular aircraft when the aircraft reached the Middle Marker. (RT 3304) However, he told the pilot he would take him to a certain point on the glideslope and would terminate the approach there; he never advised the pilot once the target was observed at that point; he did not terminate the approach at the Middle Marker; and he never advised the pilot he was going to extend the approach to a new termination point. (RT 3287–3288)

John McCormick, who worked from 1954 to 1965 in the FAA area office of Los Angeles International Airport, testified to the origin of the practice whereby PAR Controllers at Los Angeles advised pilots when the aircraft was passing the Middle Marker. The PAR equipment was used primarily to monitor ILS approaches. (RT 3677) Under this procedure, the radarscope is observed as a secondary navigational aid; the controller might remain silent throughout the ILS approach if the pilot does not deviate from the glide path or he might advise the pilot if the aircraft is above or below the glide path; the controller says less than he would in the case of a full PAR approach. (RT 1701–1702) Knowledge by the pilot when the aircraft reached the Middle Marker was an inherent part of the ILS approach. (RT 2867–2870) Starting in 1950 it became customary practice for a Los Angeles PAR Controller monitoring an ILS approach to advise, "passing the Middle Marker," when the aircraft was over the Middle Marker. (RT 1958; 1986) The practice of giving this advisory that the aircraft was passing the Middle Marker was carried over into the procedure followed in full PAR approaches. (RT 3677) The practice had the tacit approval of the FAA. (RT 2711) The advisory was not provided for by the Air Traffic Control Procedures Manual. (RT 3676) However, the FAA permitted a local facility to adopt a practice not provided for in the Manual in order to account for a local condition. (RT 2859–2860; 2888–2889) At Los Angeles, aircraft made many ILS approaches that were monitored by the PAR Controllers. (RT 2713) The advisory provided a double check to a pilot making an ILS approach that his marker beacon receiver was turned on. (RT 3675) The pilot could associate the Middle Marker with the ILS landing minimum. (RT 1694) The advisory alerted pilots that the monitoring service would be stopped and that this was the point at which the approach procedure might not be able to be carried on. (RT 2710) An advisory that the aircraft was at the Middle Marker was not deemed an invasion of the pilot's area of responsibility because it is the pilot who uses the Middle Marker. (RT 1699)

Pilots have heard PAR Controllers at Los Angeles tower advise that the aircraft was over the Middle Marker. (RT 309) Normally the Middle Marker is located at a point along the glideslope where the lowest published minimums are reached. (RT 4409) The advisory that the aircraft is passing the Middle Marker is virtually the same as telling the pilot he is at minimums. (RT 3674) At Los Angeles International Airport Runway 25 Left, the Middle Marker intercepts the glideslope at 209 feet altitude and the aircraft arrives at the minimum altitude of 200 feet or the decision height in less than a second. (RT 3673–3674) Thus, the advisory would give a

pilot a little advance notice before the aircraft is at minimums, so the pilot could condition himself for going around or continuing. (RT 3674–3675) If the pilot is not advised that he is passing the Middle Marker and is below minimums, there is a possibility that the pilot did not get a chance to react at his minimums. (RT 3675) The Middle Marker is a landmark on the approach in the area of 200 feet altitude above the ground, where the pilot must make his decision. (RT 1789–1790)

The PAR Controller who conducted the fatal approach usually followed the practice of telling the pilot that he was passing the Middle Marker as a current event. (RT 3131; 3234) Nevertheless, on this occasion the only advisory that he gave the pilot concerning the position of the aircraft in relation to the Middle Marker used the past tense, "passed the Middle Marker". (RT 3238; 3243; 3263) It was estimated that the PAR Controller waited 35 to 45 seconds after the aircraft had already passed the Middle Marker to advise him that he had passed the Middle Marker, assuming from subsequent advisories that the aircraft was coming up over Aviation Boulevard. (RT 1935) At one point a Government witness testified that there was sufficient time to advise the pilot that the aircraft had arrived at the decision height. (RT 1994–1995) There had only been two aircraft operations in twelve minutes and this was not a congested situation. (RT 2909) The Controller had time to tell the pilot other things between the pilot's "put me right down on the runway" and the Controller's "take over visually". (RT 3217) The PAR Controller gave no reason why he departed from his own customary practice of advising the pilot when the aircraft was passing the Middle Marker as a current event. (RT 3243) At 4:09 P.M. he advised the pilot, "Now passing abeam the Hollywood Race Track" (Exhibit 4A, p. 8). He suggested the possibility that he was busy adjusting the radar gain to get the target more clearly in focus when it was moving past the Middle Marker. (RT 3299)

However, he added that the gain is varied continuously throughout the approach to get a more workable target and the PAR Controller merely works harder as the target moves closer. (RT 3301) It was also suggested that, as the airplane was passing the Middle Marker, the PAR Controller may have been giving a heading change or an altitude deviation which was more important. (RT 2938) However, it was admitted that the Middle Marker was an aid, since it was set at the approach minimums. (RT 2432) The PAR Controller who conducted the fatal approach knew that the minimums for the approach were approximately at the Middle Marker and, since he did not tell the pilot when he was passing the Middle Marker, he assumed that the pilot would rely on his altimeter to know when he reached his minimums. (RT 3308–3309)

The three-mile precision radarscope has a half-mile range mark which is a half nautical mile from touchdown, and the Middle Marker is located 985 feet east of the half mile range mark. (RT 2010–2011; 2015; 3134; 3233) The average controller knows within 25 feet, or about three seconds, when the aircraft has reached the landing minimums. (RT 1057–1059)

The PAR Controller continued the approach to a point at which he felt the safety of the aircraft was imperiled. On the three mile radarscope elevation display, there is a line on each side of the glide path line representing a half degree deviation in the space above and below the glide path, and these lines depict a safety zone which represents the maximum limits an aircraft can deviate from the glide path without: (1) approaching too close to obstructions if below the lower limit, (2) being too far above the glide path to complete a normal approach if above the upper limit (Exhibit 13, p. 35). The safety limit lines on the three mile radarscope used for this approach terminated at a point about one half mile from touchdown and at that point the safety limits are almost touching the 25 foot deviation lines. (RT 2136, Exhibit

13, p. 32) Therefore, if the aircraft was 25 feet low, west of that point, it would necessarily be outside the safety limits, because at the half mile point a target 25 feet above or below the glide path would be outside the safety limit lines. (RT 2042; 3191) In this approach of the Cessna, and up to the half mile point the aircraft radar target stayed within the safety limit lines etched on the radar-scope display. (RT 3140; 3142; 3157)

When this target continued its descent westward beyond the half mile point and was observed to go 25 feet below the glide path, in the Controller's judgment the safety of the flight was likely to be affected, since if the pilot was not in visual contact and he continued to stay 25 feet below the glide path he might hit an obstruction. (RT 3122; 3176; 3182) As the pilot approached touchdown, he would be in more and more danger. (RT 3192)

Under Section 344.9 of the Air Traffic Control Procedures Manual, the following procedure is required:

"If an aircraft exceeds the lower and/or lateral limits of the prescribed safety zone to a point where, in the judgment of the controller, safety of flight is likely to be affected, the pilot shall be instructed to climb to a specified altitude and fly a specific course, as appropriate." (Exhibit 17, pp. 3–15)

Under Section 394.7 of the Manual, the following negative phraseology is required:

"To instruct a pilot to discontinue approach when the aircraft exceeds safety limits: IF RUNWAY NOT IN SIGHT, CLIMB IMMEDIATELY TO (altitude), TURN LEFT/RIGHT, HEADING (degrees), (reason and further clearance, if appropriate), ACKNOWLEDGE." (Exhibit 17, p. 3026)

Normally, the pilot responds "Roger". (RT 327–328) The PAR Controller responsible for the fatal approach admitted that to the extent that he thought that "safety of flight is likely to be affected,"

Section 344.9 came partially in effect. (RT 3184) He explained that, when a PAR Controller sees a target drop to 25 feet below the glide path at a point west of the half-mile point, the Controller cannot assume that the pilot has visual contact with the runway even if the reported weather is VFR, so the phraseology used is "IF RUNWAY NOT IN SIGHT" the pilot should execute a missed approach. (RT 3178) He admitted that if the target was below the safety limit lines before it got to the half mile point and the Controller felt that the safety of the flight was likely to be affected, the Controller was required to follow Section 344.9 of the Manual. (RT 3193) He admitted that, when the target was further west of the half mile point, the risk to the safety of the flight would be greater because the plane is physically closer to the ground. (RT 3197) He wanted the pilot to see the approach lights or the runway lights and, if he did not see them, he wanted the pilot to climb westbound to VFR conditions on top. (RT 1951–1952) The required phraseology is considered mandatory, because the intent of the language is that the pilot either land or execute a missed approach. (RT 3861–3864; 3866) Government witness McCormick admitted that the only guidance the pilot has is the PAR Controller if he wants to complete the approach safely and that, if the Controller makes a mistake, it isn't the pilot's fault. (RT 3867)

After the PAR Controller told the pilot to adjust descent, he didn't follow through. (RT 1949–1950) Instead the PAR Controller gave the instruction:

"[T]ake over and complete your landing visually on runway two five left if you're not ah contact execute a missed approach climb westbound to VFR conditions on top." (Plaintiffs' Exhibit 4A, p. 9).

He did not use the required negative phraseology, "IF RUNWAY NOT IN SIGHT, CLIMB IMMEDIATELY." He did so at a time when the pilot was definitely below the 200 feet minimum altitude. (RT 3277) He tried to justify

the change on the basis that the phraseologies were equivalent, but they were not. (RT 3251) In fact, the words, "take over and complete your landing visually," constituted an instruction, as distinguished from an advisory. (RT 2519–2520) He claimed that he assumed that the pilot was in visual contact at that portion of the approach, because the pilot should have previously established visual contact at the minimums and the pilot had previously asked, "put me right down on the runway". (RT 3185–3187; 3193; 3265) Yet, earlier in his testimony, the PAR Controller admitted that the reason for the phraseology, "IF RUNWAY NOT IN SIGHT," was that the Controller could not assume that the pilot had visual contact with the runway even if the reported weather is VFR, when a target goes 25 feet below the glide path west of the half-mile point. (RT 3178) He admitted that a pilot had a reaction time after any advisory. (RT 3201) Pilots were known to take 4 to 5 seconds to correct a heading. (RT 1473) Even if the pilot had stayed on course and glide path and had not descended below the glide path, when the aircraft reached the end of the runway, where the PAR approach would normally be terminated and the advisory required by Section 394.10 of the Air Traffic Control Procedures Manual would be given, the phraseology used would be "over end of runway, take over visually," but there would be nothing said about "complete your landing". (RT 3265–3267)

While the PAR Controller did not define the peril which then endangered the aircraft's safety, it is clear from the evidence that disorientation of the pilot is one of the perils that the PAR Controller could have negligently generated by his misleading, confusing, improper and unduly deferred advisories. Having led the pilot to this circumstance, it was the duty of the Controller to advise the pilot of the existence of an emergency condition in order that the pilot might take such measures as he deemed appropriate. Restatement of Torts, 2d, § 321:

"Duty to Act When Prior Conduct is Found to be Dangerous.

(1) If the actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect.

(2) The rule stated in Subsection (1) applies even though at the time of the act the actor has no reason to believe that it will involve such a risk.

Comment:

(a) The rule stated in Subsection (1) applies whenever the actor realizes or should realize that his act has created a condition which involves an unreasonable risk of harm to another, or is leading to consequences which involve such a risk. The rule applies whether the original act is tortious or innocent. If the act is negligent, the actor's responsibility continues in the form of a duty to exercise reasonable care to avert the consequences which he recognizes or should recognize as likely to follow. But even where he has had no reason to believe, at the time of the act, that it would involve any reasonable risk of physical harm to another, he is under a duty to exercise reasonable care when, because of a change of circumstances, or further knowledge of the situation which he has acquired, he realizes or should realize that he has created such a risk."

This rule was adopted and followed by the Ninth Circuit in the case of Furumizo v. United States, supra, 381 F.2d 965 at 968–969 (9th Cir. 1967).

Disorientation is the inability of a pilot to sense accurately the attitude of the aircraft and occurs when a pilot, flying under instrument conditions, diverts his attention from instrument reference in the cockpit in order to see a visual reference obscured by fog. Disorientation has been the subject of consideration by the FAA in connection

with the conduct of a precision approach.[9]

It is a foreseeable risk of harm that the phraseology, "Complete your landing visually," in a communication from the PAR Controller to a pilot whose reliance thereon has been engendered, might induce a competent instrument pilot to prolong his lookout by trying to find enough runway on which to make a landing out of his approach as he traverses an area of fog.[10]

The inducement of prolonged lookout by a pilot trying to find enough runway on which to make a landing out of his approach as he traverses an area of fog so increases the hazard that the pilot may be unable to overcome disorientation. Disorientation of a pilot can be overcome only by the total concentration of the pilot upon his instruments to the exclusion of any sensation to which he may otherwise be subjected with regard to the attitude of the aircraft.[11]

It was the uniform custom and practice at the time of the final approach herein for PAR Controllers to use uniform phraseology, because pilots might become familiar with phraseology which, if not used on all occasions, might induce confusion and disorientation thereby exposing the persons in the aircraft to hazard.[12]

The PAR Controller here failed to discharge his duty of due care when he informed the pilot, "Take over and complete your landing visually." He violated the Air Traffic Control Procedures Manual, §§ 344.9 and 394.7 (Exhibit 17). He negligently failed to instruct the pilot to "climb immediately." He negligently failed to use the uniform terminology which would be necessary to convey to the pilot the fact that in the judgment of the PAR Controller the flight was in danger. He negligently failed to obtain an acknowledgement from the pilot. The phraseology selected by the PAR Controller for the final communication increased the risk of harm by the use of the words "Complete your landing visually."

 The pilot quite reasonably might have prolonged his diversion from his instruments while attempting to complete his landing visually as a normal response to the negligent final communication of the PAR Controller: "Complete your landing visually." The phraseology selected by the PAR Controller may well have induced confusion and disorientation in the pilot, exposing him, the passengers in the aircraft and the persons on the ground, and their property, to all reasonably foreseeable hazards, including the disorientation of the pilot and other forces such as the effects of wing tip vortices. Had the PAR Controller used the mandatory language of Section 394.7 and instructed the pilot to "climb immediately," the dangers of disorientation and wing tip vortices would have been averted. His failure to do so was negligence and a direct and proximate cause of the crash of the Cessna, the deaths of the pilot and passengers, the injuries to the mechanic on the ground and the accompanying property damage.

*THIRD THEORY OF LIABILITY: The PAR Controller Was Negligent In Failing To Give The Warning Required By The Air Traffic Control Procedures Manual, § 411.7.*

Section 411.7 of the Air Traffic Control Procedures Manual provides as follows:

"When controllers *foresee* the *possibility* that departing or *arriving* aircraft might encounter rotorcraft downwash, thrust stream turbulence or wing tip vortices from preceding aircraft, cautionary information to this effect should be issued to pilots concerned.

Note—Since the existence and effect of turbulence is unpredictable, the provision of the above information does not constitute the placing of responsibility on controllers to anticipate in all cases the need for such information."

9. RT 1238, 1266–1267, 3809–3810.

10. RT 1241–1243, 3975–3976.

11. RT 1272–1273.

12. RT 2665, 2991.

(Emphasis added.)

This requires that the PAR Controller must exercise his judgment and issue a warning when he foresees a possible danger from wing tip vortices. The word "foresee" as utilized in this section of the Manual contemplates the examination of existing conditions and the exercise of judgment. Section 411.7 contemplates that the Controller will examine the conditions present and will, in the exercise of his judgment, determine if there is a possibility of hazard from wing tip vortices; then if it is determined that there is such a possibility, he is required to issue a warning. The obligation of Section 411.7 cannot be performed unless the Controller exercises judgment. Yet it was the practice of the PAR Controller here involved never to exercise judgment in determining whether there was a possibility of hazard in vortices.[13] This practice is a violation of the regulation.

■ The failure to exercise judgment when required by the Air Traffic Control Procedures Manual is a breach

---

13. The first witness called in the trial was A. B. Bush, the Chief of the Los Angeles tower, who, when asked whether there was a custom and practice among the controllers as to the length of time that would be observed between aircraft before a warning was given responded (RT 169): "I would guess as a practice two or three minutes;" and went on to state there was no specified length of time observed between a very light aircraft and a very heavy aircraft. He knew no basis for the two or three minute separation time and could recall no school or educational process prior to December 6, 1962, at which the controllers or anyone in command at the tower were made acquainted with the phenomenon of wing tip vortices. (See also, testimony of Merle Nichols, RT 2066) Perhaps the most cogent testimony on this phase of the case was that of Mr. Edmund Burke who told the Court that the IFR–VFR separation standards which were established in the early 1950's (RT 987) were still the standard for the controllers insofar as separation of aircraft for turbulence warning purposes are concerned:

"A If it gets substantially beyond that into the area of two or three miles, it is not issued; that is correct.

"Q All right. So that is the standard—I mean that's the only criteria as to issuing or not issuing, as I understand your testimony?

"A That's the practice, yes, sir.

"Q That is the general practice among controllers across the U. S., and you are assuming, and we are to assume, that that was the practice in 1962 at Los Angeles International Airport?

"A Yes, sir.

\* \* \* \* \*

"Q I mean it doesn't make any difference to him, he doesn't make a judgment as to whether—well, this three mile separation involves one very large aircraft and one very small one? As long as there are three miles there, he has made his decision; isn't that right?

"A Yes, sir, that's true.

"Q And similarly, if there is a varying wind condition or weather condition, the controller does not take that into account as long as he has the set three-mile separation?

"A I would say this is true, yes sir." (RT 989)

This witness went on to testify that the spatial separation was applied irrespective of the speed of the aircraft. (RT 995) Mr. Burke admitted that the practice simply grew among the controllers:

"Q Is there any other standard set by the FAA for controllers' with respect to turbulence other than this three and 1½ mile separation we have discussed?

"A Now, the agency has never set a standard. The standard has been adopted by the controllers through their work experience. So, it becomes a practice.

"Q In other words, when you said here last Friday [as] far as the book is concerned, it is very, very loose guidance to the controller, is that right?

"A I would say it is very broad." (RT 996)

\* \* \* \* \*

"Q In your opinion a practice has been built up, grown like Topsy, as the Court said yesterday, with respect to a rule of thumb that you are using. That rule of thumb has nothing to do with time separation of the aircraft, and only has to do with the spatial separation of the aircraft, isn't that true?

"A In my opinion, this is true, yes sir." (RT 1769)

A key part of Mr. Burke's testimony was given with respect to Exhibit 55, an Air Traffic Service Bulletin issued by the FAA on November 15, 1962, which con-

of air safety regulations and constitutes negligence. Furumizo v. United States, supra, 245 F.Supp. 981 at 992 (D.Hawaii 1965).

Section 411.7 provides that this service shall be performed for both departing and arriving aircraft. The practice of this PAR Controller was never to provide this service to arriving aircraft. The Air Traffic Control Procedures Manual requires a separation distance of one mile between aircraft under VFR conditions and three miles under IFR conditions. The PAR Controller arbitrarily adopted the practice that warnings for wing tip vortices would never be given if under VFR conditions there was a one mile separation and if under IFR conditions there was a three mile separation, although the purpose of these separation distances was for interspatial safety and not turbulence safety. The effect of the practice was that vortices warnings were never given to arriving aircraft and this practice obviously completely nullifies the safety regulations of Section 411.7 as to arriving aircraft.

 The FAA was fully aware that these mere separation distances were not sufficient under all circumstances to protect against the hazards of wing tip vortices. This awareness is fully apparent from examination of the legislative history of Section 411.7 reported in Furumizo v. United States, supra, 245 F.Supp. 981 at 1002–1010. The practice of the FAA controllers in general and the PAR Controller here involved, in eliminating this service cannot be condoned as the exercise of a discretionary function. The FAA has no discretion to eliminate a service which is required by regulation. United Airlines, Inc. v. Wiener, 335 F.2d 379 (9th Cir. 1964). The IFR–VFR separation distances do not apply to departing aircraft. Cf. Hartz v. United States, supra; Furumizo v. United States, supra. Yet the regulation, Section 411.7, specifically and expressly requires warnings to both departing and arriving aircraft.

 In a Federal Tort Claims Act case, the court applies the law of the place of the tort. Roberson v. United

---

tained information gathered by the Agency in the time prior to its publication. (RT 1000) This Exhibit, referred as it does to the Bleviss report of 1954, unequivocally charges the FAA with knowledge of the rule of thumb separation time recommended in the Bleviss report, which was the only Douglas report on vortices prepared prior to 1962, the date of the ATS Bulletin.

Examination of the testimony of Gerald Feltman, the PAR Controller in this particular instance, is the culmination of the practice of the FAA and its controllers. Mr. Feltman had received no specific training as to wing tip vortices or the effect of wind conditions upon the persistence of the turbulence resulting from vortices (RT 3336–3338) and did not see a training film on the subject until 1965. He was never instructed prior to December, 1962 that with a light crosswind a separation time between a light aircraft and a DC–6B would be five to ten minutes, and that aircraft larger than a DC–6B could create stronger vortices and more turbulence. (RT 3339) He was never formally instructed how long the turbulence created by a large jet aircraft could possibly last nor was he ever

told prior to the accident date that turbulence could be hazardous to light aircraft at time intervals beyond five minutes. (RT 3340) Prior to December, 1962, he had never received any specific instructions with reference to the time a light aircraft should be separated from a large jet aircraft making a missed approach. (RT 3341) There was no exercise of judgment in issuing or not issuing a turbulence warning and that was true in the instant case.

"Q * * * Now I want to know whether or not that is what you did in this case of the Cessna. There was no other aircraft within three miles of it, so you gave no warning?

"A I really don't recall the approach or anything, but as normal operating procedure this is the reason I would not have given it.

"Q AND UNDER A SITUATION LIKE THAT, YOU WOULDN'T EVEN MAKE A JUDGMENT ON IT? YOU SIMPLY WOULDN'T GIVE IT?

"A IN THAT PARTICULAR CASE, OR IN THIS PARTICULAR CASE, THAT IS CORRECT." (RT 3344, 3345)

States, 382 F.2d 714, 717 (9th Cir.1967) ; Bartholomae Corp. v. United States, 253 F.2d 716, 73 A.L.R.2d 1293, 1299 (9th Cir. 1957).

■ When a violation of a safety regulation constitutes negligence per se under state law, such rule is applicable under the Federal Tort Claims Act. Cronenberg v. United States, 123 F.Supp. 693 (D.N.C.1954) ; Cerri v. United States, 80 F.Supp. 831 (N.D.Cal.1948) ; Worley v. United States, 119 F.Supp. 719 (D.Ore.1952).

In those jurisdictions in which the violation of a safety regulation is negligence per se, the violation of a safety regulation promulgated by the FAA is negligence per se. Eastern Air Lines v. Union Trust Company, 95 U.S.App.D.C. 189, 221 F.2d 62 (1955).

■ Under California law, violation of a safety regulation enacted by an administrative agency raises a rebuttable presumption of negligence. Nevis v. Pacific Gas & Elec. Corp., 43 Cal.2d 626, 275 P.2d 761 (1954).

■ Where there has been a violation of a safety regulation, the burden of going forward with the evidence shifts to the defendant to excuse such violation by establishing any one of the following:

1. That it was beyond the ability of the defendant to comply with the regulation.
2. That the action taken by the defendant was what might reasonably be expected of a person of ordinary prudence acting under similar conditions who desired to comply with the law.
3. That the defendant was non-negligently ignorant of the facts which made the safety regulation applicable.

Lokey v. Pine Mountain Lumber Co., 205 Cal.App.2d 522, 23 Cal.Rptr. 293 (1962) ; Nevis v. Pacific Gas & Elec. Corp., supra.

■ Upon the foregoing, the Court finds that there was a violation of a safety regulation. Whether it constituted negligence per se or merely raised

a rebuttable presumption of negligence, the Defendant has not established that such violation was excusable.

*FOURTH THEORY OF LIABILITY: The PAR Controller Was Negligent In Failing To Give The Instruction Required By The Air Traffic Control Procedures Manual, §§ 344.9 and 394.7.*

Section 344.9 of the Air Traffic Control Procedures Manual provides as follows:

"If an aircraft exceeds the lower and/or lateral limits of the prescribed safety zone to a point where, in the judgment of the controller, safety of flight is likely to be affected, the pilot shall be instructed to climb to a specified altitude and fly a specific course, as appropriate."

During the approach, and as the Cessna neared the ground, at one point the aircraft was 25 feet below the glide path and at this point the PAR Controller felt that the safety of the aircraft was imperiled. This judgment by the PAR Controller imposed upon him an additional obligation to advise the pilot to *"climb immediately."* The express mandatory terminology is set forth in Section 394.7 of the Air Traffic Control Procedures Manual which provides as follows:

"To instruct a pilot to discontinue approach when the aircraft exceeds safety limits: IF RUNWAY NOT IN SIGHT, CLIMB IMMEDIATELY TO (altitude), TURN LEFT/RIGHT, HEADING (degrees), (reason and further clearance, if appropriate), ACKNOWLEDGE."

The PAR Controller did not use the mandatory language specified in this section, but instead instructed the pilot as follows:

" * * * going twenty five feet below the glide path adjust descent take over and complete your landing visually on runway two five left if you're not ah contact execute a missed approach climb westbound to VFR conditions on top." (Plaintiffs' Exhibit 4A, p. 9)

■ There are circumstances in which it is negligence to fail to utilize the mandatory language of the Air Traffic Control Procedures Manual. This was the situation in Hartz v. United States, supra, 387 F.2d at 874 (5th Cir. 1968), in which the FAA Controller warned the pilot of wing tip vortices by using the words "watch the prop wash" instead of utilizing the mandatory language, "caution, turbulence." The reasoning of the court in holding this to be negligence was that "prop wash" is of less severity than "wing tip vortices", and, therefore, the pilot was misled by the language. A comparable circumstance exists in the case before us.

The evidence here shows that there are two acceptable methods of executing a missed approach. One involves an immediate climb, and the alternate involves a more gradual ascent by gaining speed prior to climbing. In a nonemergency situation either one is an acceptable method. However, in an emergency situation such as the one the PAR Controller believed to be confronting the pilot in the present case, the safer method was clearly to climb immediately. The mandatory language required by Section 394.7 recognizes that there are a variety of hazards which may exist at low altitudes which can be escaped by climbing immediately. The pilot in this case encountered one of these hazards which can exist at low altitudes, namely, wing tip vortices, and possibly another such hazard, disorientation, and the crash was a proximate result of the fact that the pilot was not instructed to climb immediately.

Accordingly, the Court finds that the failure of the PAR Controller to instruct in the language of the Manual was a violation of the safety regulations, Section 394.7, and was negligence which was a direct and proximate cause of the crash.

The principal defense of the United States was that it is physically impossible for severe hazards from wing tip vortices to have existed for a period of ten to twelve minutes. This argument was predicated upon a hypothesis based on a formula that wing tip vortices can only remain violent for one to two minutes. This theory suffers in two respects. First, the formula itself contains certain assumed and unproven values; and second, the formula does not work in actual experience. Several pilots presented testimony that they had encountered violent wing tip vortices long after the one to two minutes such vortices could have lasted if the formula was accurate.

The Court accepts the testimony of these pilot witnesses who actually experienced violent wing tip vortices from 3½ to 7½ minutes after the passage of aircraft, and must, therefore, exclude the validity of the formula.

The United States presented no acceptable explanation for the crash. The evidence excludes any failure on the part of the pilot or the aircraft. The final violent maneuver was beyond the controlled capacity of the aircraft. The Court necessarily finds that it occurred as the result of turbulence from wing tip vortices, the only outside force acting upon the aircraft.

■ Since there are two acceptable methods of executing a missed approach, and since it is apparent from the evidence that the pilot was beginning to execute one of these methods, the Court finds no contributory negligence on the part of the pilot.

A missed approach or go-round is the terminology used to describe the situation in which an aircraft which has made an approach for landing, and for one reason or another, aborts the landing and proceeds in a designated course over the runway, regains full flying speed, and proceeds either to another landing attempt or to another airport, dependent upon the reason for the missed approach.

Customarily on a PAR approach, the pilot is advised at the outset what the missed approach procedure for the particular runway is. Thus at Los Angeles International Airport, where there are no obstacles such as buildings or trees between the airport and the Pacific Ocean on the west, the procedure is to fly straight ahead and climb to an alti-

tude of 2000 feet within a distance of 20 miles. There is no evidence that there is any regulatory or other requirement that an aircraft attain any other specific intermediate altitude at any particular point on the missed approach. This was pointed up in the testimony of the witness David Irvine on cross-examine by Mr. Fareed:

"Q Assume that at the point of decision, at the point where he decided he didn't have visual contact, he was at 57 feet over Aviation Boulevard, and that in the course of the attempted missed approach, which I take it is your opinion in this case, he attempted a missed approach, in the course of that missed approach he failed to retract his landing gear and flaps; would that effect in any way, in your opinion, that this missed approach procedure was prudently exercised under those adverse circumstances?

"A In no way, no way. The easiest, shortest way to the ground is panic. And if he starts immediately pulling switches, when you have plenty of time—he has got 20 miles to get his gear and flaps up." (RT 4378)

Two chief areas of controversy appear to have arisen with respect to the conduct of the flight from the point where the pilot was instructed to take over visually and land or if not contact to climb to VFR conditions on top. The first of these is whether he was, in fact, making a missed approach from the takeover point to the point some 3000 feet down the runway where the plane veered to the left and crashed. Factually, there appears to be no question that full power was added to both engines some thirty seconds prior to the time of the actual crash as testified to by one of the few percipient witnesses in the trial, Mr. Bernard T. Siefert, an industrial fireman employed by North American Aviation Company, whose duty station at the time of the crash was at a point between the point of crash and Runway 25 Left.

"Q Prior to the time of that crash, did you or not have occasion to hear any airplane engines?

"A Yes Sir, I did.

"Q And would you state how those engines sounded?

"A Well, when I first heard them they were what I would—in my opinion was a normal cruising speed or normal plane in flight. About a minute or so later it sounded to me like the pilot had pushed the throttle, full throttle, full power on his plane. About thirty seconds later I heard the crash.

"Q Now, you have been around the airport or have been around the airport for some period of time working?

"A Yes Sir, I have.

"Q And did you have experience of hearing the airplane engines on small planes, light planes?

"A Yes, Sir, I have.

"Q This change of power to the higher power, what was that like? Would it be similar to a plane with its engines full open for take off, or something like that?

"A Yes Sir. As I said, it sounded to me like he had pushed his throttle all the way full, and was getting full power—attempting to get full power from the aircraft." (RT 451)

The witness went on to reaffirm a previous sworn statement that the power was added some 30 to 60 seconds prior to the crash itself. This estimate of time at which full power was added is consistent with the distance travelled by the aircraft from the point of takeover to the point of crash. Mr. Siefert was not cross-examined nor was contrary evidence adduced. The evidence, in the form of time indications on the tower tape, shows with certainty that the elapsed time from the point where the pilot was told to take over and the point where the plane disappeared from the ASDE radar was 36 seconds.

There is uniform agreement among the expert pilot witnesses from both sides that the first action of a pilot in executing a missed approach is the application of full power to the engines by advancing the throttle controls:

| | |
|---|---|
| Vance Breese | - (RT 406); |
| Mervyn A. Davenport | - (RT 2472); |
| Frances Tanner | - (RT 2781); |
| David Irvine | - (RT 4348, 4368); |
| John McCormick | - (RT 3972); and |
| Elwin Sullens | - (RT 347). |

———◆———

This is consistent with the provisions of the Operating Manual in evidence as Exhibit H, at pp. 2–6:

"Go Round (Twin Engine)

(1) Apply full throttle and increase engine speed to 2625 RPM, if necessary.

(2) Reduce flap setting to 15°.

(3) Trim airplane for climb.

(4) Retract flaps as soon as all obstacles are cleared and a safe altitude and airspeed are obtained."

There was agreement among the pilots that landings are not conducted with engines at full throttle. Government pilot witness, Cyril Tanner:

"Q Have you ever heard or seen an airplane land with throttles full up?

"A Have I ever heard or seen—

"Q Heard of or seen an aircraft land with throttles full up?

"A Not to my recollection." (RT 2811)

Plaintiff pilot witness David Irvine:

"Q * * * —is the fact that the throttles were described as being full open, is that consistent with a missed approach?

"A Yes, Sir, it would be.

"Q Is there, usually speaking, from a pilot's standpoint any likelihood of a landing being accomplished or attempted with throttles full open?

"A No, Sir, there is not." (RT 4348)

Other evidence on the missed approach question comes from the series of remarks among the controllers who were observing the progress of the aircraft on the ASDE radar equipment after the takeover point. Such remarks should be considered in the light of the fact that the speed of a landing aircraft decreased noticeably and the further fact that these controllers, through experience, are able to accurately determine the conduct of an aircraft through the radar return. The questioning centers around interpretation of a series of controllers' remarks or exclamations which were found on the control tower tape. (RT 479) Witness Vance Breese:

"Q My question to the witness is: Was there any significance to this statement, 'Well, I don't know if he is on the ground he is going to beat hell'?

"A Yes, I think it is a very clear indication of a missed approach procedure.

"Q And the next statement is local controller to ASDE, according to Government's Exhibit, 'Ah he is going around': What does that mean?

"A That means he is executing a missed approach procedure.

"Q Now, these statements, according to the transcript which was just handed to his Honor, are made at about 4:10:50 in point of time?

"A Yes, Sir.

"Q The statement by one of the controllers, 'He looks like he is hauling the mail and hasn't slowed it down any': Does that have any significance?

"A Yes, that again indicates clearly that he had no intention to land. He was executing a missed approach procedure. He has increased his speed to a point which would permit him to climb on out.

"Q The words 'he missed,' what does that 'missed' mean?

\* \* \* \* \* \*

"A It means the conditions would not permit him to land. Therefore, he executed a missed approach procedure. He could not see the necessary 2600 feet down the runway which would have permitted him to land legally. Therefore, he increased his speed to climb on out." (479–480)

It is noteworthy that these interpretations of the meaning of the exclamations by the controllers were not challenged by the Government at any point in the trial by producing the controllers to testify.

It cannot be determined definitely whether the wheels and flaps were retracted. No eye witness to such fact was produced. It comes only as an inference from certain facts obtained after the crash. The investigator, Robert Gilmour, was permitted to testify only to what he found upon examination of the wreckage and not to a conclusion that such condition existed at the time of impact. (RT 3529) The position of indicators and levers in the cockpit of the Cessna 310–G aircraft when examined following the crash must be viewed with regard to the severity of the impact and the extent of the destruction as shown in the photographs of the wreckage (Exhibits 16–16A in evidence). And if, from such evidence, an inference is permitted that the wheels and flaps were down during the initial stages of the missed approach, this condition could not have any causal effect upon the crash. The instruction manual (Exhibit H, pp. 2–6, quoted above) does not even require that the wheels be retracted in a go-round procedure and the flaps are left down to 15° according to the recommended procedure. The testimony of David Irvine, a witness for the Plaintiff, goes directly to the point. Mr. Irvine has been a pilot for 38 years, flew with the armed services for 14 years, and is a designee of the FAA to administer private and commercial flight tests to applicants for pilot ratings:

"Q Is it absolutely necessary in making an efficient missed approach to have the wheels up over the first 3000 feet?

"A It is not.

\* \* \* \* \* \*

"Q These questions are directed to a Cessna 310 within the confines of what we are talking about here in this case. Do you understand that?

"A I understand.

"Q Is it absolutely necessary in making a missed approach to have the flaps full up during the first 3000 feet?

"A It is not."

"Q You see nothing unusual in this missed approach?

"A No, Sir." (RT 4348)

The question with respect to the contended requirement that a pilot initiate a climb immediately upon starting a missed approach was the subject of varying testimony and opinion from the experts. Generally speaking two Government pilot witnesses, Mervyn Davenport and Cyril Tanner, took the view that the climbing attitude should be taken as soon as the missed approach was initiated. Plaintiff pilot witness, Vance Breese, was one of the opinion that speed is the crucial factor (RT 591) and that a pilot might very well disregard increasing altitude immediately in favor of building up airspeed (RT 696):

"A I think he was encountering turbulence that was quite unexpected, and it was keeping him busy in the cockpit to a point where he felt he was better off with the speed in order to improve the controllability of the aircraft rather than with altitude.

"Q In that connection you used a phrase yesterday of trading altitude for speed. What do you mean by that?

"A You trade altitude for speed, and conversely by climbing he reduces the speed. By keeping the nose down he increases the speed without climbing.

"Q What does that reduction in speed do to the controllability of the aircraft?

"A It reduces the controllability of an aircraft in that region.

"Q When you used the phraseology 'trading altitude for speed', was it your intent to state that you felt that he had continued straight ahead to get up speed rather than climbing out?

"A Precisely.

"Q Is there anything negligent— strike that. Is there anything improper about a pilot trading altitude for speed?

"A Not at all.

"Q Does it depend on each pilot as to what he desires to do under any particular instance?

"A The pilot and the conditions."

Two of the pilot witnesses who were not on the same side of the case appeared to have similar opinions on the subject. They were David Irvine, called by Plaintiffs, and John McCormick, called by Defendant. These two witnesses agreed there are two equally acceptable methods of making the missed approach. (RT 4347) David Irvine:

"Q Now, with respect to making a missed approach in a Cessna 310 aircraft, there has been testimony that there are two ways to make the approach; one, to apply power and pull up immediately, and there has also been testimony that power can be applied maintaining the same altitude. Do you agree or disagree with those two versions?

"A No sir. I don't disagree, depending on the situation and the possible obstruction.

"Q What do you mean the presence of possible obstruction?

"A Well, there is a possibility—there are many airports and some, of course, are so located geographically that you do have an obstruction on climbout, and at that point you do need altitude.

"Q Is that true or not at Los Angeles Airport?

"A It is not true.

"Q In your opinion as a pilot is either method acceptable?

"A It certainly is."

(RT 4389):

"The Court: Do you think it was reasonable and prudent for this pilot to travel at a height of somewhere under 150 feet, say 100 to 200 feet, with flaps down, gear down and full power, for a period of 3000 feet after he made up his mind to execute a missed approach?

"The Witness: No sir, I do not think it was unusual.

"The Court: My question was do you think it was prudent and reasonable?

"The Witness: I believe it was prudent and reasonable."

(RT 4400):

"The Court: Let me see if I understand you. Do I understand you to say that this would be reasonable and prudent if flaps and gear were started to be retracted during that 30 seconds or 3000 feet going down the runway?

"The Witness: Yes, sir.

"The Court: But it would also be reasonable and prudent to not pull up the flaps and gear during that 30 seconds or 3000 feet down the runway? Either procedure, as I understand you, is prudent?

"The Witness: Either procedure in that 30 second interval."

844

And, similarly, in the testimony of Government pilot witness, John McCormick (RT 3758):

"The Witness: * * * It is kind of a coordinated effort. You can do it another way. You can just go full power and let the air speed pick-up while maintaining altitude. But the prudent way is to start climbing up right away.

"The Court: I heard some talk about you sacrifice speed for altitude or you sacrifice altitude for speed. You can't get them both at the same time, is that right?

"The Witness: Let me put it this way: supposing you are close to the stall point in space and the pilot wants to recover from this situation. The full power application is made. He has plenty of altitude underneath him. So, he will lower the nose of the aircraft and pick up his air speed before he starts to climb.

"But, you don't necessarily have to do it that way. You could apply full power, maintain what altitude you have, and then milk up the flaps which is providing the high drag that is keeping your aircraft slowed down, and allow it to accelerate. At the same time you are climbing slowly.

"The Court: Are both ways approved ways?

"The Witness: It depends on where you are. If you are low enough or too low to sacrifice any altitude, then you are stuck with this other way. I won't say stuck, but I will use the other method.

"The Court: Which is to get speed first and then try for altitude?

"The Witness: Hold your altitude and get your power on and allow the speed to gradually pick up in the climb while you bring up your drag items which are the flaps. * * *"

(RT 3761):

"The Court: I heard one witness, and I thought he said—and I wonder if you think it is right—say that you are coming in and are about to land like that. If you suddenly decide you have to make a missed approach, since you have plenty of room out there, nothing but runway and ocean, the important thing is not altitude but speed. You have plenty of room out there to get high enough speed, so that when you do start to climb you won't stall. So, you move up instead of flopping around.

"The Witness: This is one technique. There is no problem with this.

"The Court: Is it a good technique?

"The Witness: It is a good technique, sure. There is no problem there. But, it could be done the other way."

And in another answer at page 3763:

"A * * * But, the other way is used. It is just a matter of choice. * * *"

And, again, in response to questions on cross-examination (RT 3972):

"Q With respect to the character of the missed approach about which you testified yesterday, you agree, do you not, that there are, at least, two optional ways in which to make a missed approach; is that right?

"A Right.

"Q One you can apply power and pull up immediately, is that correct? And another, you can apply power maintaining the same altitude and milk the flaps up?

"A That is correct.

"Q And let the airplane gain speed at that altitude?

"A Correct."

In addition to the above, the final instruction of the PAR Controller to the pilot should be taken into account. The pilot was expressly directed to "climb to VFR conditions on top" which is a distinct variation from the missed approach procedure which prescribed climbing to 2000 feet in a distance of 20 miles. From all the evidence before the Court, it would appear that the obstructing fog layer over the runway was shallow and

flat and that the Cessna was proceeding above it over the runway which would constitute a strict adherence to the Controller's instruction, i. e. it had proceeded to "VFR conditions on top." The pilot's observance of the Controller's directive, even if erroneously given, would furnish an additional reason why the pilot did not climb out immediately.

This finding of the Court that the pilot was not guilty of contributory negligence is, of course, not essential to the judgment in favor of the passenger Plaintiffs and ground Plaintiffs; and those Plaintiffs are obviously not bound by this determination upon the issue of contributory negligence of the pilot.

## THE DAMAGES OF PLAINTIFFS

██ This crash occurred in the State of California, and the measure of damages, therefore, is governed by the law of the State of California in force and effect at the time of death. United Air Lines, Inc v. Wiener, 335 F.2d 379, 407–408 (9th Cir. 1964).

Section 377 of the California Code of Civil Procedure provides that in every action for wrongful death, such damages may be given as under all the circumstances of the case may be just.

██ The decisional law of the State of California teaches that as elements of damages the court shall take into account the pecuniary value of the loss of support, comfort, society, protection and guidance of the decedent suffered by each heir of the decedent.

As a direct and proximate result of the plane crash, the Cessna 310–G airplane was completely demolished. The Plaintiff Eagle Star Insurance Company paid the sum of $82,250.00 under its policy of hull insurance to the Gordon Supply Company and was subrogated in this amount. The Government stipulated that the damages to be awarded to Eagle Star Insurance Company is the sum of $82,250.00.

██ As a direct and proximate result of the crash, the pilot, James Gordon, met his death. He was 45 years of age at the time of his death, and had a life expectancy of 27.3 years. He left surviving him as his sole heirs, his wife, Joan Gordon, age 31 years, whose life expectancy exceeded that of the deceased, and five children whose names and ages at the time of his death were as follows: James Prescott Gordon, 16 years; Cynthia Jane Gordon (Sare), 11 years; Deborah Lynn Gordon (Sare), 10 years; Carol Gordon, 9 years; and Judy Gordon, 8 years.

James Gordon was a kind and loving husband and father. He was engaged in the business of real estate and land development and was the sole owner of a corporation known as Gordon's Supply Company, in which name he transacted most of his business. He was earning substantial sums of money each year in his business and was experienced and accomplished therein. He contributed substantial sums of money each year to the support of his family, afforded care, protection and guidance to his wife and children, and had evidenced his desire that his children have a college education and be suitably provided for. The pecuniary value of the loss of support, comfort, society and guidance to his wife and family is the sum of $683,180.00. Said sum shall be distributed as follows:

| | |
|---|---|
| James Prescott Gordon | – $32,000.00; |
| Cynthia Jane Gordon (Sare) | – $44,000.00; |
| Deborah Lynn Gordon (Sare) | – $46,400.00; |
| Carol Gordon | – $48,800.00; and |
| Judy Gordon | – $51,200.00. |

———◆———

The balance thereof, $460,780.00, plus the sum of $2,500.00 as the cost of decedent's funeral, is awarded to his widow, Joan Gordon.

▮ Bervial Carrington, a passenger in the airplane, was killed as a direct and proximate result of the accident. At the time of his death, he was 44 years of age, and had a life expectancy of 28.4 years. He left surviving him his widow, Edith Carrington, age 48 years, whose life expectancy exceeded that of the decedent. Mr. Carrington was a kind and loving husband, was earning a substantial income in the carpet business and was contributing substantial sums each year for the care and maintenance of his wife. The Court finds that Edith Carrington suffered pecuniary loss by reason of the loss of support, comfort, society and guidance of her late husband in the sum of $358,775.00, and that she suffered damage by reason of the funeral expenses in the sum of $2,500.00, or a total of $361,275.00. It was stipulated that the Government is entitled to a credit of $50,000.00 as against this award. The net recovery by Edith Carrington is, therefore, the sum of $311,275.00.

▮ Further, as a direct and proximate result of the accident, Dale Dexter Lightenburger, another passenger in the airplane, was killed. At the time of his death he was 42 years of age and at one time had been employed by Lloyd S. Sheppard. Mr. Sheppard had been engaged in the furniture business since 1936, had owned his own furniture business in Las Vegas, Nevada, from 1948 to 1966 and has since then owned an interior decorating and contract business in Las Vegas, Nevada. Sheppard employed Dale Dexter Lightenburger as a furniture salesman in about 1955. Lightenburger remained in Sheppard's employ until 1960, during which time Lightenburger became a sales manager, whose duties included determining credit, working with apprentice salesmen, advertising, and management of the business. Lightenburger, as a sales manager, was entitled, in addition to the ordinary compensation, an override over the business of all the salesmen, whereas an ordinary salesman received a percentage of only his own sales. In 1960 Lightenburger left Sheppard's employ in Las Vegas, Nevada, to take a better opportunity in Los Angeles, California, but in 1962, Sheppard persuaded Lightenburger to return to his firm in Las Vegas. Lightenburger had the capacity to earn as much as $2,400.00 per month in commissions. The trend of furniture business in the Las Vegas market has been consistently upward for ten years owing to the population growth.

Lightenburger remained until about November 10, 1962, when he signed an employment contract with Carrington Carpet Company.

Lightenburger had an established earning capacity as a manager of a furniture business in the Las Vegas, Nevada area at the time he entered into an employment contract with Carrington Carpet Company.

Carrington Carpet Company was an established furniture business in Las Vegas, Nevada, at the time it contracted to employ Lightenburger. The sales of Carrington Carpet Company had progressively grown as follows: $186,935.67 in 1960, $385,085.66 in 1961, and $578,050.80 in 1962. The sales of Carrington Carpet Company would have naturally and probably increased at least five per cent per annum. Carrington Carpet Company had previously demonstrated a nine per cent rate of return on sales as its net profit.

Under the terms of the Carrington-Lightenburger employment contract, Lightenburger was entitled to the following future earnings: $200.00 weekly plus a three per cent commission on merchandise Lightenburger sold, and in addition thereto, a share of projected net profit (after deduction of $350.00 per week for Carrington's salary) as follows: 20%–1963, 25%–1964, 30%–1965, 35%–1966, 40%–1967, and 40% thereafter. The terms of said employment contract would probably have continued after the period provided for therein. It is probable that Lightenburger would personally have accounted for fifteen per cent of the total sales of Carrington Carpet Com-

pany each year and that Lightenburger would have received three per cent commission on such sales.

The probable expenditure by Lightenburger for his self-maintenance would have been sixteen per cent of his income.

The probable income of Lightenburger, the deduction of ten per cent business expenses and deduction for income taxes, and the probable contributions to his widow and children, discounted at 4¼% per annum, constitute the basis for determining the present value of Lightenburger's net earnings available to his widow and three children.

Lightenburger was 42 years old at the time of his death, and he had a work-life expectancy of 23 years. His life expectancy did not exceed that of his widow and three children. At the time of the death of the decedent Lightenburger, his widow, Geraldine L. Lightenburger was 34 years of age, and the ages of his three children were as follows: Gregory Dale Lightenburger—7 years; Denise Sue Lightenburger—10 years; and Madylon Leslie Lightenburger—11 years.

The present value of the net earnings available to Lightenburger's widow and three children is $368,344.00. Of this amount, $338,344.00 shall go to Geraldine L. Lightenburger, and $10,000.00 shall go to each of the three minor children.

Lightenburger was a strong family man; he was a good father, having adopted two of the minor children; the family was close; and he gave a substantial amount of his time to his family. The present value of the loss of probable future companionship, society and comfort was $25,000.00 by Geraldine L. Lightenburger and $10,000.00 by each of the three children.

A $1,242.48 funeral bill was paid by Geraldine L. Lightenburger, for which she is entitled to recover.

Therefore, the Lightenburger Plaintiffs are entitled to receive as follows:

| | |
|---|---|
| Geraldine L. Lightenburger | — $364,586.48; |
| Gregory Dale Lightenburger | — 20,000.00; |
| Denise Sue Lightenburger | — 20,000.00; and |
| Madylon Leslie Lightenburger | — 20,000.00. |

As a result of this crash, two planes owned by Plaintiff North American Aviation, Inc., a corporation, which were on the ground at the time, were partially burned and damaged. North American Aviation, Inc., a corporation, is entitled to receive the sum of $53,415.61 for the reasonable cost of repairing its planes and the reasonable value of renting substitute planes while they were being repaired.

At the time of the crash, Plaintiff Ivory Combs was working on one of the planes on the ground while acting as an employee of Plaintiff North American Aviation, Inc. The force and violence of the crash caused a quantity of flaming gasoline to be hurled in and around the area where Plaintiff Ivory Combs was working, thereby causing him to be knocked to the ground and requiring him to crawl through the gasoline flames on his hands and knees in order to save his life, thereby causing serious and permanent bodily injuries. These injuries required hospital, medical and surgical care, and also resulted in both temporary and permanent disabilities. North American Aviation, Inc., pursuant to the provisions of the California Workmen's Compensation Laws, expended the sum of $12,888.55 for hospital, medical, surgical, temporary disability compensation benefits and permanent disability compensation benefits furnished to its employee, Ivory Combs, and which resulted from the injuries received as a result of the crash. By reason thereof, North American Aviation, Inc., is entitled to payment of its subrogation

claim for workmen's compensation benefits furnished to Ivory Combs in the sum of $12,888.55 in addition to the aforesaid damages to the two planes. By reason of the foregoing items and elements of damages, Plaintiff North American Aviation, Inc. is entitled to receive the total sum of $66,304.16.

At the time of the crash, Plaintiff Ivory Combs was 57 years of age, in good health, and with a life expectancy in excess of 16 years. He was steadily employed as an engineering flight test chief mechanic by Plaintiff North American Aviation, Inc. for whom he had worked steadily for over twenty years. The injuries sustained by him as a result of the crash included extensive, severe and painful second and third degree burns of the head and face extending from the forehead to the chin, including both eyes, the outer and inner area of the lip and mouth, with permanent scarring of the burned areas and with permanent loss of pigment in the skin, with burning, stinging and watering of the eyes, and with periodic blister formation on the face; extensive, severe and painful second and third degree burns of both hands and wrists with the burns involving the tendons of both hands with extensive loss of skin of both hands and with extensive permanent scarring of the skin of both hands with permanent loss of pigment of the skin of both hands and with permanent stiffness and weakness of both hands, including the thumbs and fingers whereby there is a permanent loss of approximately 50 per cent of the strength of the left and 60 per cent of the right, or major hand, with a 25 per cent loss of motion of both hands and a 25 per cent loss of flexion of the wrists of both hands; a fracture of the scaphoid bone of the left wrist with permanent pain and weakness resulting therefrom; a severe bursitis of the left elbow, causing pain and disability and suffering for approximately eight months; the causing of permanent thin, tissue-like skin of both hands and wrists, which are tender and require ointments daily to prevent drying and cracking, and which require wearing of gloves while working to prevent pain and injury to the hands; loss of normal feelings in the skin of both hands whereby the danger of further injury is increased; loss of normal blood supply to both hands whereby healing in the event of injury is impaired and the danger of infection is increased; severe and prolonged physical and mental pain, suffering, worry and anxiety since the time of the accident in 1962. Plaintiff Ivory Combs will probably suffer further physical and emotional pain, suffering, worry and anxiety intermittently for the balance of his life. He returned to light work provided by his employer North American Aviation, Inc., on October 30, 1963, and has been able to continue working for the company thereafter, despite his serious and permanent disabilities, which limit and handicap him in his work, due to the tolerance and cooperation of North American Aviation, Inc., in permitting him to work with his physical handicaps resulting from the crash. The injuries and permanent disabilities resulting therefrom permanently disable Plaintiff Ivory Combs from competing in the open labor market for work with an employer other than North American Aviation, Inc. He had a normal future earning capacity of four years after reaching the normal retirement age of sixty-five, had he not been injured in the crash. This earning capacity was destroyed by the injuries received in the crash. At the time of the crash, he was earning $135.60 per week. Had he not been injured, his earnings would have increased to $136.00 per week on January 27, 1963, and to $139.20 per week on October 25, 1963. He received $70.00 per week from North American Aviation, Inc. as workmen's compensation on benefits from December 7, 1962 until he returned to work on October 30, 1963, thereby making his net loss of earnings for the period the sum of $3,024.70. He is presently earning $166.00 per week, which equals $8,632.00 per year. Upon retiring at the age of sixty-five, he will receive $200.00 per month or $2,400.00 per year,

which results in a net loss to him of $6,232.00 per year for the four years he would normally have worked beyond the age of sixty-five had he not been injured and for which he is entitled to be compensated in the sum of $24,928.00. In addition to the foregoing damages for loss of past and future earnings and earning capacity, Plaintiff Ivory Combs is entitled to receive general damages for his aforesaid injuries and their consequences, past and future, in the sum of $47,047.30, thereby making an aggregate total judgment of $75,000.00 which Plaintiff Ivory Combs is entitled to receive separate from and in addition to the workmen's compensation benefits received by him from North American Aviation, Inc. and for which North American Aviation, Inc. is entitled to be separately reimbursed and paid as hereinbefore set forth.

The foregoing Opinion prepared and now rendered by the Court shall and does constitute the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure.

Let judgment be entered accordingly.